

UNITED STATES DISTRICT COURT
for the
DISTRICT OF CONNECTICUT

---

|  |  |  |
|---|---|---|
| MARIO RICHARDS,<br>Plaintiff, | : | CIVIL NO. 303CV00630 (DJS) |
| | : | |
| v. | : | |
| | : | |
| COMPUTER SCIENCES<br>CORPORATION.<br>Defendant. | : | OCTOBER 14, 2003 |

---

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND PERMISSION TO SERVE NOTICE

### INTRODUCTION

Defendant Computer Sciences Corporation ("CSC") opposes Plaintiff's Motion for Class Certification because Plaintiff has failed to show that he is similarly situated to the class he asks to represent. In support of his motion, Plaintiff provides only his own Affidavit testimony, much of which testimony CSC has moved to strike because it is not based on his personal knowledge or because it is plain hearsay.

In both his Complaint and his motion, Plaintiff speaks of a group of employees he calls either the "Computer Systems Analysts" or "Customer Service Analysts". (Plaintiff's Motion p. 1). He claims these employees are similarly situated to each other, and to him, at CSC facilities throughout the country even though he never worked for CSC anywhere but at the Norwich, Connecticut facility, and there only about two years. However, there is no such classification at CSC called "Computer Systems Analyst" or "Customer Service Analyst". There are employees called Customer Support Analysts at the Norwich facility. The Norwich facility employs technical staff of different levels with varying job duties and responsibilities, and the Customer Support Analyst is a level one position.

Plaintiff has worked for defendant only as a Customer Support Analyst, level one, yet he seeks to represent a class consisting of what he calls "all current and former computer systems analysts a/k/a customer service analysts employed at CSC in the States of Connecticut, Maryland, Texas and California." (Pl.'s Mot. p. 1). His Affidavit provides no evidence that any other Customer Support Analysts are similarly situated to him or to each other; he simply claims to have "personal knowledge" that they are, not only at the Norwich facility but at other CSC facilities as well. He also claims to know, but without any supporting

2

facts, what CSC's hiring policies are, what all the Customer Support Analysts do each day across the country, and what their prior computer experience and educational backgrounds are.

However, CSC shows that Plaintiff's Affidavit is a sham without any evidentiary support, and that the employees he seeks to represent are not similarly situated to him either at the Norwich facility or at any other location. The duties and responsibilities among the various levels of Customer Support Analysts are very different; they have different work habits and responsibilities; have different customers with varying contractual requirements; have different managers; and have different start-up and stopping schedules. Plaintiff's narrow experience and job functions at the Norwich facility cannot serve to represent the broad class he proposes. Plaintiff's motion for certification and notice must be denied.

I.    **FACTS**

CSC provides information technology ("IT") services to companies throughout the world, including consulting, systems integration and outsourcing. CSC's outsourcing services offer customized IT solutions, which can include custom tailored "Help Desk" services for the specific business needs of the client. (Affidavit of Stephen Fenter at

¶3).[1]  The Help Desk provides 24 hour a day, seven day a week single point of consultation service for the client for all technical problems, requests, services, and inquiries.  This includes calls for all IT problems which, if not resolved during the initial consultation are referred to the next level of technical assistance. (Fenter Aff. ¶4) (Affidavit of Amos Daniels at ¶3)[2].

CSC's current United States Help Desk operations are in Norwich, Connecticut and Las Colinas, Texas.  The company previously operated a Help Desk in San Diego, California, which ceased operations in approximately July 2003.  CSC does not and has not maintained a Help Desk facility in Maryland.  (Fenter Aff. ¶5).  CSC's Help Desk provides clients with custom solutions from mainframe password resets to complex first call resolution service level agreements for all infrastructure platforms.  This includes providing clients with access to a diverse group of experienced technical staff who possess the expertise and skills to diagnose and solve a wide array of IT issues.  The technical staff address calls for various IT issues involving desktops, laptops, workstations, applications, internet access and networks. (Fenter Aff. ¶7).

---

[1] The Affidavit of Stephen Fenter, dated October 14, 2003, is filed simultaneously herewith and is hereinafter referenced "Fenter Aff. ¶ __."
[2] The Affidavit of Amos Daniels, dated October 14, 2003, is filed simultaneously herewith and is hereinafter referenced "Daniels Aff. ¶ __."

**A.    The Help Desk Customer Support Analysts.**

The Help Desk employs technical staff of different levels—level one, two and three—with varying job duties, requirements, skills, and expertise.  The duties for each of these positions are distinct and varied based upon technical complexity, client specific expectations, and contractual obligations.  (Fenter Aff. ¶9) (Daniels Aff. ¶5).  The Customer Support Analyst ("CSA") is level one technical staff, and is the first point of contact for clients to resolve various computer systems, software, and hardware problem.  (Fenter Aff. ¶10) (Daniels Aff. ¶6).

The CSA position requires broad based technical expertise, an understanding of technical terminology, computer concepts, and specialized knowledge about computer hardware, software applications, networks, internet applications and operating systems.  (Fenter Aff. ¶11).  CSAs are generally required to respond to incoming inquiries to the Help Desk and to resolve computer systems, software, and hardware problems for CSC clients.  This involves the analysis of information and the comparison of possible courses of action.  The CSA decides on a course of action after considering the various possibilities and recommends a solution or other action to be taken by the Help Desk's technical staff in

accordance with the client's particular contractual requirements. (Fenter Aff. ¶12) (Plaintiff's Deposition at page 163).[3]

The Help Desks in different geographic locations support different clients. The major clients of the Norwich Help Desk include, but are not limited to, United Technology Corporation ("UTC") (Pratt & Whitney and Sikorsky are divisions of UTC); General Dynamics; eMedNY; Saint Vincent's Hospital of New York; and General Motors Locomotive Group. The Help Desk support for these clients is in Norwich, Connecticut and not in Las Colinas, Texas. (Fenter Aff. ¶13). The major clients of the Help Desk in Las Colinas currently include, but are not limited to, Gulfstream, the County of San Diego, the Department of Education, British Aerospace (BAe), and Raytheon. The Help Desk support for these clients is based in Las Colinas, Texas and they are not supported from the Norwich, Connecticut facility. (Daniels Aff. ¶7).

CSAs are generally assigned to a specific client account and are required to become familiar with the technical systems, contractual requirements, and process requirements of the client they serve. (Fenter

---

[3] All exhibits referenced herein are attached to the Affidavit of Tasos C. Paindiris, (Paindiris Aff.), dated October 14, 2003, filed simultaneously herewith.

Copies of relevant pages from Plaintiff, Mario Richards' deposition, dated September 30, 2003, are attached as Exhibit 1 to the Paindiris Aff. and are hereinafter referenced "Pl. Dep. at __."

Aff. ¶14). CSC maintains service level agreements (SLA) with its clients which set forth the specific terms and conditions of the computer support service to be provided by the Help Desk personnel. The SLAs set forth the contractual commitments to clients regarding the support work performed by the Help Desk. The SLAs vary depending on the specific requirements of the client. The contracts with some clients in Norwich, such as those for UTC, General Motors Locomotive Group, and Saint Vincent Hospital, subject CSC to a significant financial penalty if its staff does not satisfy the SLA requirements. (Fenter Aff. ¶15). The contracts with some clients in Las Colinas, such as those for Gulfstream, County of San Diego, and Raytheon, also subject CSC to a significant financial penalty if its staff does not satisfy the SLA requirements. (Daniels Aff. ¶8).

SLAs can include the average time it requires to answer a call; the number of "Abandons," which are the number of people who hang up before having their call resolved by the Help Desk; the percentage of calls resolved during the first call by the client, also referred to as the first call resolution rate; the amount of time it takes to resolve the issue on the first call; percentage of issues that must be reopened; and client satisfaction. The requirements in the SLAs vary based on the demands and contractual commitments to each specific client. (Fenter Aff. ¶16) (Daniels Aff. ¶8).

7

The clients serviced by the Help Desk use a wide array of computer system platforms, configurations, and applications. These include Windows based computing platforms; UNIX computing platforms; mainframe computing platforms; mid-range mainframe computing platforms; telephony support; network support, which could include Novell and Windows NT; Blackberry; Virtual Private Network (VPN) Accounts; and Oracle PeopleSoft. (Fenter Aff. ¶17) (Daniels Aff. ¶9). CSAs who are transferred from one client account to another must therefore undergo specialized training with respect to the client's systems and requirements. (Fenter Aff. ¶18) (Daniels Aff. ¶10).

CSAs handle most Help Desk calls independently and are responsible for compliance with SLA requirements. CSAs may also confer as needed with supervisors and other staff and escalate problems to higher level technicians and other specialists to resolve more sensitive, technically complex, and client specific service issues. (Fenter Aff. ¶19). CSAs are required to utilize their analytical ability, technical training, knowledge, and skills to resolve client issues, and the CSA position requires theoretical and practical application of highly specialized knowledge in computer systems. The CSA applies systems analysis techniques and procedures, including consulting with users, to test, modify, and document computer

8

systems or programs based on and related to user or system design specifications. (Fenter Aff. ¶20). Failure of the CSA to properly resolve or otherwise manage a client issue could result in loss of the client's valuable and sensitive data, or work stoppage due to inoperative computer systems. Additionally, some clients, such as Saint Vincent's, utilize the services of CSAs to resolve problems with computer systems involved in patient care. (Fenter Aff. ¶21).

CSAs may also use a technical database known as the "knowledge base." The knowledge base is a computer based tool maintained by CSC which contains information relating to certain common IT issues. While the knowledge base may provide general information about certain types of issues, CSAs utilize this information as a diagnostic tool, and it remains the CSAs responsibility to employ a variety of procedures and available tools to resolve a client's issue. (Fenter Aff. ¶22).

CSAs often take calls about computing environments, computer screens and applications that they are unable to see. They therefore must exercise judgment, analytical and oral communication skills, along with specialized knowledge about the client's computing environment and interrelationships among system components to

9

visualize the technical situation facing the client, decipher incomplete and sometimes faulty descriptions or problems, and talk the client through the request to resolve it. (Fenter Aff. ¶23). CSAs interact with users of varying computer sophistication, and must be capable of understanding technical concepts then translate them into actions that can be executed by the client. (Fenter Aff. ¶24) (Pl. Dep. at 166-67).

Analytical and problem-solving skills are critical for successful job performance as CSAs must evaluate ambiguous, often times incomplete and conflicting information from clients, understand alternative approaches and use proper judgment to identify the best approach to resolve the problem. The first step in this analysis is to gather the relevant facts about the nature of the problem. This information is then utilized by the CSA to assess whether the problem can be resolved or must be referred to another level for further review. (Fenter Aff. ¶25).

If the CSA cannot resolve the problem it may be passed on to level two technicians depending on the specific client requirements. For example, on the UTC account serviced in Norwich, if a call is not diagnosed and solved by a CSA it may be passed to level two technicians. Depending on the nature of the problem, either the CSA or the level two technician may refer the matter to level three technicians, who work on site

10

at UTC. In contrast, on the St. Vincent's account, which is also serviced in Norwich, there are no level two technicians in the Help Desk and the calls may proceed from level one to the on site level three technicians. (Fenter Aff. ¶26). The procedures for Las Colinas clients also vary. For example, on the County of San Diego account, if a call is not diagnosed and solved by a CSA, it may be passed on from Las Colinas to level two technicians who are on site at the client in San Diego. In contrast, Raytheon does not have level two technicians, but has a "hot handoff team" of CSAs at the CSC facility in Las Colinas who are more experienced and skilled and who receive calls from the other CSAs. On the Gulfstream account, calls may be passed to level two technicians within CSC, and depending on the nature of the problem, either the CSA or the level two technician may refer the matter to level three technicians, who work on site at Gulfstream. (Daniels Aff. ¶11).

The level two technicians are required to possess a wider breadth and depth of technical expertise about IT systems, and more specialized knowledge about computer hardware, software, applications, networks, and operating systems than the CSAs. The level two technicians often have specialized expertise in one or more technical areas and have more in-depth knowledge of the technical environment of several clients.

This experience, background and expertise allows the level two technicians to support multiple clients. (Fenter Aff. ¶27) (Daniels Aff. ¶12). CSC's clients, which include large defense contractors such as UTC, General Dynamics, and Raytheon maintain sophisticated security protocols and systems to protect highly sensitive information maintained on the computer systems. The clients therefore have specific security requirements for personnel who are authorized to work on the IT systems. (Fenter Aff. ¶28) (Daniels Aff. ¶13). Level two technicians often have greater access rights to the client's systems. For example, a level two technician may have access to certain files in the client's system that the CSA cannot access. (Fenter Aff. ¶29) (Daniels Aff. ¶14). The level three technicians work on site with the clients and are not located in Norwich. (Fenter Aff. ¶32).

The CSA must also document information regarding the identity of the caller, the nature of the problem, and the action taken on the call in the company's ticketing system. It is important for the CSAs to accurately record this information as the "ticket" may be forwarded to level two and/or level three technicians for further action. (Fenter Aff. ¶30) (Pl. Dep. at 169).

The CSAs analyze data and make decisions that are of substantial importance to the business operations of CSC. The CSAs are the primary contact with CSC's Help Desk clients, and their performance therefore directly impacts CSC's relations with its clients and determines whether CSC satisfies its contractual obligations to its clients. (Fenter Aff. ¶31).

**B.    Plaintiff's Employment With CSC.**

Plaintiff began working for CSC as a CSA in February 2001, he is currently employed at CSC's Help Desk in Norwich, Connecticut, and he has held no other position during his employment with CSC. (Pl. Dep. at 69, 72, 157). As a CSA, Plaintiff has been paid on a salary basis, and he receives the same pay regardless of the number of hours he works. (Pl. Dep. at 66-67). Plaintiff's salary is currently $37,740 annually. (Pl. Dep. at 66).

When Plaintiff commenced his employment with CSC he was assigned to service the Sikorsky account, which is part of the UTC family of companies. (Pl. Dep. at 72). He has since worked on the Pratt & Whitney account, which is also part of UTC. He currently works on the Saint Vincent's Hospital account. (Pl. Dep. at 143). Plaintiff is not familiar with the SLAs or the contract requirements for customers of CSC other

13

than those he has worked on while employed, and thus he only knows how calls are handled on the Pratt & Whitney, Sikorsky and Saint Vincent's accounts. (Pl. Dep. at 350, 451). Plaintiff does not even know how calls are handled for other divisions within UTC. (Pl. Dep. at 451).

To the extent Plaintiff worked on different accounts during his employment with CSC, he handled the calls in different ways for each account, and he used different tools to resolve problems depending on the account. (Pl. Dep. at 366; 452-53). For example, for the UTC accounts, Pratt & Whitney and Sikorsky, when Plaintiff could not solve the problem he would send the matter to the second level immediately, while the user is on the phone, and "assign it to the second level queue." (Pl. Dep. at 366-67). For the Saint Vincent account, when Plaintiff could not solve the problem he would transfer the matter to a work flow organization to evaluate the ticket and assign it to a technician on site. (Pl. Dep. at 367).

While Plaintiff lists the following positions in his Amended Complaint, he has never held these or any position other than CSA during his employment with CSC: system administrator, system analyst, system technician, programmer analyst, software engineer, application developer, network administrator, network engineer, technology architect, information system architect, information security technician,

14

telecommunications technician, and Help Desk support. (Pl. Dep. at 104-109). Plaintiff also has no personal knowledge of what individuals in these positions do at CSC or how individuals in these position are paid. (Pl. Dep. at 104-109).

Plaintiff acknowledges that the level two technicians in Help Desk are "different," that they have access to certain information and systems the level one CSAs do not have, and that some of them have specific skills sets different from his own. (Pl. Dep. at 137, 453). For example, there are certain customer problems Plaintiff cannot correct because he does not have the access to go into the computer system and resolve it, but the level two technician would have that access. (Pl. Dep. at 455).

Plaintiff has no personal knowledge of all the duties performed by level two technicians, rather, he would only review the tickets he referred to the level two technicians to see what they did with them. (Pl. Dep. at 137, 141). He also has no knowledge of why the level two technicians have access to certain applications that are not accessible by the level one CSAs, he has no first hand knowledge of the education level required of level two technicians, the prior experience required of level two technicians, or the training required of level two technicians. (Pl.

Dep. at 369; 458-60).  In fact, Plaintiff claims he has been told not to even go to the level two area and that he was not to be shown how to perform level two tasks. (Pl. Dep. at 142-43).  He claims he was "chastised" for working with other staff members. (Pl. Dep. at 396-97).   In addition to the differences between the level one CSAs and level two technicians, Plaintiff contends there were some tasks that only a very limited number of analysts and technicians could perform.  For example, Plaintiff describes a procedure for sending encrypted files that only he and two other individuals have the ability to perform. (Pl. Dep. at 139).

Plaintiff claims to use the "knowledge base" for every call to determine the steps he has to follow, however, he has no information as to how much the other analysts use the knowledge base. (Pl. Dep. at 442, 444).    Moreover, to the extent the knowledge base does not have information or has information that requires revision, Plaintiff and other CSAs have the opportunity to submit information for inclusion in the database.  (Pl. Dep. at 444).   While Plaintiff has chosen not to submit information, he does not know whether other CSAs have submitted information.  (Pl. Dep. at 445-46).  Plaintiff also does not know whether and to what extent other CSAs vary from the information contained in the knowledge base when resolving customer problems. (Pl. Dep. at 446).

Not only does Plaintiff lack first hand knowledge of the work performed by the other members of his purported class, but he is also distinguishable from the other Help Desk employees based on his disciplinary record. Plaintiff has received warnings and has been the subject disciplinary action due to his performance and conduct on the job. Most recently, Plaintiff was removed from the UTC account he was supporting due to violation of security procedures relating to his improper disclosure of a password to one of the client's employees. (Pl. Dep. at 143-46). Additionally, in April 2002, Plaintiff was suspended due to unprofessional and disrespectful behavior in the workplace. (Pl. Dep. at 154) (Exhibit 2). Plaintiff also received a final written warning in March 2001 for unsatisfactory conduct relating to shouting at co-workers and inappropriate behavior. (Pl. Dep. at 152) (Exhibit 3).

In sum, Plaintiff claims that he performs certain tasks, follows certain procedures, and uses certain tools in his position as a CSA, level one, but he has no personal knowledge of what the tasks, procedures, and tools are for any other CSAs or other Help Desk technicians, particularly those in other geographic areas, working on other accounts, and/or who are in different level positions. He also acknowledges that his tasks, procedures and tools were different depending on the particular account

he was assigned to service. Plaintiff further claims he does not create solutions to customer problems, but he has no information as to what extent other CSAs create solutions to problems reported by customers. (Pl. Dep at 368; 453). Finally, in complete contradiction to the arguments presented in his Class Motion, Plaintiff testified that the only CSC employees who he believes are similarly situated to him with respect to his claims under the FLSA are the CSAs at the Help Desk in Norwich, Connecticut. (Pl. Dep. at 348).

II.    **ARGUMENT**

   A.    **A Collective Action In This Matter Is Inappropriate Under The FLSA.**

The FLSA authorizes "one or more employees to pursue an action in a representative capacity for other similarly situated employees." Mem. of Decision and Order, <u>Mike v. Safeco Ins. Co. of America</u>, No 3:02CV2239 (DJS) (D. Conn. July 15, 2003), at 5-6 (citing 29 U.S.C. § 216(b)) (Exhibit 4). "This type of action allows potential class members who are similarly situated to the named plaintiff to 'opt-in' to the case." <u>Id.</u> at 5. Collective actions under the FLSA "are intended to serve the interests of judicial economy and aid in the vindication of plaintiffs' rights." <u>Freeman v. Wal-mart Stores, Inc.</u>, No. 02-5161, 2003 U.S. Dist. LEXIS 6664, *4 (W.D.

Ark. Apr. 15, 2003) (citing Hoffmann-LaRoche Inc. v. Sperling, 493 U.S. 165, 110 S. Ct. 482, 107 L. Ed. 2d 480 (1989)) (Exhibit 5).

### B.    Plaintiff Must Present Evidence That He Is Similarly Situated To Members Of The Purported Class.

Courts utilize a two-step approach to certifying collective actions under the FLSA and Plaintiff fails to satisfy the first step.   In the first phase of an FLSA collective action inquiry, the court "must decide whether the plaintiff has presented significant evidence that similarly situated potential plaintiffs exist.  This decision is made after the plaintiff has petitioned for judicially-certified notification of putative class members and come forward with competent evidence suggesting that such class members exist."   H&R Block, Ltd. v. Housden, 186 F.R.D. 399, 400 (E.D. Tex. 1999) (citing Mooney v. Aramco Services Inc., 54 F.3d 1207, 1213-14 (5th Cir. 1995)). See also Mike, at 6.

### C.    Plaintiff Does Not Meet the Substantial Evidence Showing for Granting a Class.

Plaintiff's only support for his contention that he is similarly situated to all the other CSAs is his own Affidavit – a probatively worthless document – that Defendant has moved to strike in significant part.  Plaintiff's Affidavit is not based on his personal knowledge and it contains hearsay.   The Affidavit alleges in sweeping assertions that

Plaintiff, in effect, knows what all of the other CSAs do at other CSC facilities around the United States, and that he has known this going back three years, even though he has only worked for CSC just over two years and has never worked at any facility other than the Norwich facility.

Plaintiff's allegation that "all CSAs are required to perform tasks beyond their scheduled work day" is not just factually wrong, but legally irrelevant at this stage. Using his Affidavit, Plaintiff attempts to establish he is similarly situated by alleging that everyone in his proposed class has roughly the same kind of FLSA violation. Yet in his deposition he was compelled to answer that he does not even know all of what the other CSAs and technicians do.

**1.    Plaintiff's Affidavit Fails To Establish That He Is Similarly Situated To Other Members Of His Purported Class**

"[A] class may be certified under the FLSA if the named plaintiff can show that his position was or is similar to those of the absent class members." Freeman, 2003 U.S. Dist. LEXIS 6664, at *8. "'Similarly situated' . . . must be analyzed in terms of the nature of the job duties performed by each class member, as the ultimate issue to be determined is whether each employee was properly classified as exempt." Morisky, 111 F. Supp. 2d 493, 498 (D. N.J. 2000). Before authorizing notice to potential

class members, "the Court must determine whether other employees exist who are 'similarly situated' with respect to job requirements and pay provisions." Baum v. Shoney's, Inc., No. 98-423-CV-ORL 19-B, 1998 U.S. Dist. LEXIS 21484, *4 (M.D. Fla. Orl. Div. Dec. 3, 1998) (Exhibit 6).

It is well established that "[t]he exempt or non-exempt status of any particular employee must be determined on the basis of whether his duties, responsibilities and salary meet all the requirements of the appropriate section of the regulations . . . ." 29 C.F.R. § 542.201(b)(2). This Court in Mike denied Plaintiff's motion to proceed as a collective action "because proof in [the] case is specific to the individual." Mike at 9. "In FLSA cases, disputes regarding the nature of an employee's duties are questions of fact." Freeman, 2003 U.S. Dist. LEXIS 6664, at *9. Determining whether an employee qualifies for an exemption is extremely individual and fact-intensive, requiring "a detailed analysis of the time spent performing administrative duties" and "a careful factual analysis of the full range of the employee's job duties and responsibilities." Cooke v. General Dynamics Corp., 993 F. Supp. 56, 59-61 (D. Conn. 1997); See also Dean v. Priceline.com, Inc., No. 3:00CV1273(DJS), 2001 U.S. Dist. LEXIS 24982, *7-8 (D. Conn. June 5, 2001) (Exhibit 7).

21

According to the FLSA and the regulations promulgated thereunder, an administrative employee is one whose "primary duty" consists of performing non-manual work, involving the exercise of discretion and judgment, that is "directly related to management policies or general business operations of his employer or his employer's customers." 29 C.F.R. §§ 541.2(a)(1) & (e)(2). In other words, it is an employee:

> (1) whose "*activities*" relate to the "administrative operations of a business," rather than "production" or "sales" work;

> (2) whose work "is of substantial *importance* to the management or operation of the business" of his employer or its customers; and

> (3) whose work includes "the *exercise of discretion and independent judgment*."

See 29 C.F.R. §§ 541.2 (e)(2) & 541.205(a) (emphasis added).

The FLSA also provides that certain computer related occupations are exempt. To be eligible for this exemption the employee's primary duty must consist of one or more of the following:

> (1) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

> (2) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including

prototypes, based on and related to user or
system design specifications;

(3) the design, documentation, testing, creation or
modification of computer programs related to
machine operating systems; or

(4) a combination of the aforementioned duties,
the performance of which requires the same level
of skills.

See 29 C.F.R. § 541.303.

Plaintiff's Motion, if granted, would require the Court to

conduct a fact-intensive and individualized inquiry into each of the areas

described above for each member of Plaintiff's proposed class.[4]  To make a

determination that all members of Plaintiff's proposed group are

"similarly situated," the Court must decide whether the purported class

members can be considered clones irrespective of geographical location,

types of clients they serve, the individual demands of the job as they relate

to the particular client they are serving, (and thus hours actually worked)

and actual activities performed by each.  For example, in Mike, the Court

held:

> [R]egardless of the possibility that another
> employee's 'primary duties were to appraise
> damaged automobiles,' any other plaintiff would
> also have to present specific evidence of his or her
> daily tasks, and the court would have to apply
> the regulations on an individual basis.

---

[4] CSC maintains that Plaintiff and all other CSAs are properly classified as exempt.

<u>Mike</u>, at 9.

Plaintiff's purported class would require the same application of the regulations on an individual basis to determine whether the exemption is met. Although Plaintiff attempts to identify a class of CSAs in four different states, the only support Plaintiff provides for his claim that he and members of the purported class performed similar job duties is his Affidavit. As set forth in more detail in Defendant's Motion to Strike the Affidavit of Mario Richards, Plaintiff's allegations that he performed the same or similar job duties as members of the purported class members are conclusory, speculative, without foundation and completely lacking in any personal knowledge of Plaintiff.

In his Affidavit, Plaintiff summarily asserts, absent any personal knowledge, that he performed the same job duties as other CSAs over the past three years in four different states. Plaintiff's attempt to represent this purported class of employees should be rejected out-of-hand because Plaintiff concedes in his Affidavit that he only commenced employment with Defendant as a CSA in February 2001. (Pl.'s Aff., ¶2.) Even assuming that Plaintiff can identify a class of employees in the position of CSA, which he cannot, Plaintiff clearly has no personal

knowledge of the duties allegedly performed by employees in this purported position prior to February 2001.

Plaintiff's claim that he is similarly situated to members of his purported class is further flawed because it is based on broad, conclusory statements in his Affidavit which are not based on any personal knowledge of Plaintiff. Plaintiff states, for example, that:

- "There are a large number of current and former employees who held or currently hold the position of CSA who desire to opt in to this class." (Plaintiff's Aff. ¶3.)

- "The majority of CSAs are initially hired as hourly contract employees and later become permanent. Advanced education and experience is not required for the position of CSA. Upon hire the CSA received on the job training. The position of CSA is among the lowest of positions at CSC in the sense of knowledge, skills and pay scale." (Plaintiff's Aff. ¶4.)

- "All CSAs have the same responsibilities, tasks and duties as do I, and that have been described herein." (Plaintiff's Aff. ¶15.)

- "I have personal knowledge that other persons in the position of CSA are required to perform the same set-up, break down and email functions that I have described above prior to and after their scheduled shift and do not receive regular or overtime wage for such work. Further, other CSAs perform their normal trouble shooting functions by telephone after their scheduled shift has ended and do not receive regular or overtime wage for such work." (Plaintiff's Aff. ¶16.)

- "I have personal knowledge that CSC employed persons in the States of Maryland, Texas and California in the position of CSA within the last three years performing the same duties and tasks as described herein." (Plaintiff's Aff. ¶17.)

Not only does Plaintiff's Affidavit completely fail to establish that Plaintiff is similarly situated to members of the purported class, but it also contradicts his own deposition testimony in many ways.

2.    **The Evidence Submitted by CSC Refutes Plaintiff's Claim That He Is Similarly Situated To Members Of His Purported Class.**

Plaintiff's Motion to Proceed should also be denied because it is clear from the evidence submitted by CSC, including the Affidavits of Stephen Fenter, Amos Daniels and the testimony of the Plaintiff himself, that Plaintiff did not perform similar job duties to the members of his purported class. The employees in Plaintiff's proposed class performed job duties different from those Plaintiff claims he performed in his Affidavit. The evidence submitted by CSC establishes that CSAs perform different and varying job duties based on their location, clients served, contract requirements with those clients, levels, their experience and work schedule. For example:

- The Help Desks in different geographic locations support different clients. The clients supported in Norwich are not supported in Las Colinas and the clients in Las Colinas are not supported in Norwich.

- The service level agreements (SLA) which set forth the specific terms and conditions of the computer support service to be provided by the Help Desk personnel, vary depending on the specific requirements of the client. Additionally, the SLAs

with some clients subject CSC to a significant financial penalty if its staff does not satisfy the SLA requirements.

- The clients serviced by the Norwich Help Desk use a wide array of computer system platforms, configurations, and applications. These include windows based computing platforms; UNIX computing platforms; mainframe computing platforms; mid-range mainframe computing platforms; telephony support; and network support, which could include Novell and Windows NT. The CSAs are generally assigned to a specific client account and are required to become familiar with the technical systems, contractual requirements, and process requirements of the client they serve.

- Depending on the specific client requirements, there are different methods for escalating problems to higher levels if the problem cannot be resolved by the CSA.

- The various levels of technicians are required to possess a different breadth and depth of technical expertise about IT systems, and specialized knowledge about computer hardware, applications, networks, and operating systems than the CSAs. The level two technicians often have specialized expertise in one or more technical areas and have more in-depth knowledge of the technical environment of several clients.

- The various levels of technicians have different duties and responsibilities.

- Level two technicians often have greater access rights to the client's systems. For example, a level two technician may have access to certain files in the client's system that the CSA cannot access.

This and other courts have held that collective actions with facts such as these are an inappropriate means for determining an employee's exempt status.

> [I]n order to determine membership in the class
> [plaintiff] identified in his . . . Complaint, the
> court would have to engage in an ad hoc inquiry
> for each proposed plaintiff to determine whether
> his or her job responsibilities were similar to
> [plaintiff's]. As such, [plaintiff] has not presented
> a firm basis for the court to identify similarly
> situated individuals and has failed to meet his
> burden under the FLSA.

Mike at 9-10.

An employee's exempt status must "be determined on a job-by-job, or more likely, an employee-by-employee basis." Morisky, 111 F. Supp. 2d at 499. Plaintiff cannot maintain a collective action simply by combining all CSAs together. Their specific duties, abilities, and exercise of discretion vary in many ways. There are disparate and varied job duties performed by the members of Plaintiff's purported class. Despite Plaintiff's conclusory and vague assertions otherwise, the CSAs are not all the same as they have different ranges of discretion and authority, different duties and different levels of importance and impact on CSC's business operations.

Plaintiff does not offer any competent evidence which suggests that all CSAs – no matter what location, what client served, what contractual requirements, etc. – are similarly situated in the individual activities each performs. In fact, the evidence conclusively demonstrates

otherwise.  Moreover, Plaintiff offers no analysis of the administrative and computer-related exemptions inquiry which demonstrates a violation of the requirements of the FLSA.  He makes only a conclusory assertion that CSAs are "victims of a common scheme that deprives them of wages required by the FLSA." (Class Motion at 8.)

Plaintiff does not dispute that determining whether an employee is subject to the administrative exemption is a fact-specific, employee-by-employee task. <u>Mike</u>, supra; <u>Hodgson v. Klages Coal & Ice Co.</u>, 435 F.2d 377, 382 (6th Cir. 1970) (exempt status of any individual employee is question of fact).  This determination necessarily involves a detailed analysis of the employee's actual activities on the job, not simply a guess or an inference based on how Plaintiff performed his job duties.  Plaintiff cannot ask the Court to substitute the "individualized inquiry" required under the FLSA by glossing over this requirement and arguing for a collective action based on a broad and factually dissimilar group.  The FLSA plainly demands that a determination of exempt status must be made on an individualized basis. <u>See</u> 29 C.F.R. § 541.201(b).  This Court has, in fact, held that extremely broad collective actions, such as Plaintiff's, are an inappropriate means for determining an employee's exempt status. <u>Mike</u>, supra.

## III.  __CONCLUSION__

There is no factual or legal basis for Plaintiff's claim that he is similarly situated to the class he seeks to represent and a class cannot be certified based on a sole Affidavit, from the Plaintiff, that is replete with inadmissible statements and hearsay.  There can be no dispute that there are significant differences among the technical staff in the Help Desk, including among the CSAs themselves.  Plaintiff has not established that he is similarly situated to the purported class members and his Motion for certification and for permission to serve notice should be denied.

DEFENDANT,
COMPUTER SCIENCES
CORPORATION

By: _____
William J. Anthony (ct 17865)
Tasos C. Paindiris (ct 16739)
Jackson Lewis LLP
55 Farmington Avenue, Suite 1200
Hartford, CT  06105
Tel: (860) 522-0404
Fax: (860) 247-1330
E-mail: anthonyw@jacksonlewis.com
E-mail: paindirt@jacksonlewis.com

Lisa A. Schreter (ct17647)
Jackson Lewis LLP
245 Peachtree Center Avenue, N.E.
1900 Marquis One Tower
Atlanta, GA  30303-1226
Tel. (404) 525-8200
Fax. (404) 525-1173
E-mail: schretel@jacksonlewis.com

## CERTIFICATION OF SERVICE

This is to certify that a copy of the foregoing was sent by first class mail, postage prepaid, on this 14th day of October, 2003, to the following:

Michael J. Melly
143 Oneco Avenue
New London, CT 06320


Tasos C. Paindiris