9/30/2003                                                      Mario Richards

Page 1

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF CONNECTICUT
2

3

4      * * * * * * * * * * * * * * *
       MARIO RICHARDS,                    )
5                                         )
                     Plaintiff,           )
6                                         )    Civil Action No.
            -vs-                          )    3:03CV00630 (DJS)
7      COMPUTER SCIENCES CORPORATION,     )
                                          )
8                    Defendant.           )
       * * * * * * * * * * * * * * *

9

10

11

12                                      COPY

13

14

               Deposition of MARIO RICHARDS, taken before
15     Bethany A. Carrier, Court Reporter and Notary Public
       within and for the State of Connecticut, pursuant to
16     Notice and the Federal Rules of Civil Procedure, at the
       offices of Jackson Lewis, LLP, 55 Farmington Avenue,
17     Suite 1200, Hartford, Connecticut 06105, taken on
       September 30, 2003, commencing at 10:20 a.m.

18

19

20

21

22

23
                        Bethany A. Carrier, LSR 071
24              Brandon Smith Reporting Service
                        44 Capitol Avenue
25              Hartford, Connecticut   06106
                        (860) 549-1850


                  Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                                Mario Richards

Page 66

```
 1      A      Yes.

 2      Q      How much paid vacation do you receive?

 3      A      That's what I was asking you.

 4      Q      Well, I'm asking you to tell me what paid

 5   vacation you receive, Mr. Richards.

 6      A      Are you asking me how much time we receive?

 7      Q      Yes, sir.

 8      A      Okay.  The closest, without fractional close

 9   as I can get, is approximately 3.1 hours every two

10   weeks -- every 80 hours.

11      Q      You receive any other type of paid leave?

12      A      Sick leave.

13      Q      And how much sick leave do you accrue?

14      A      The same rate.

15      Q      Now, as an employee with CSC, you are a

16   salaried employee, are you not?

17      A      Yes.

18      Q      What's your annual salary?

19      A      $37,740.

20      Q      And you receive that same salary regardless

21   of the number of hours that you work each week?

22      A      That's correct.

23      Q      So if you work more than 40 hours you still

24   receive your weekly salary, and if you work under 40

25   hours you still receive your same salary, correct?
```

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                                Mario Richards

Page 67

1      A    My paycheck is always the same, yes.

2      Q    So your salary does not change based upon the

3   number of hours that you work each week?

4      A    That's correct.

5      Q    And you understood at the time that you came

6   to work for CSC that you would receive the same salary

7   regardless of the number of hours that you worked?

8                    MR. MELLY:  Objection.  Is that a

9   statement or a question?

10                   MS. SCHRETER:  It's a question, Mr.

11   Melly.

12                   MR. MELLY:  Didn't sound like one.

13   Sounded like a statement.  So I object to the form.

14      A    Go ahead and rephrase it.

15   BY MS. SCHRETER:

16      Q    You understood at the time you came to work

17   for CSC, did you not, that you would receive the same

18   weekly salary regardless of the number of hours you

19   worked each week?

20      A    Yes, I did.

21      Q    You also understood when you became a CSC

22   employee that you were employed at will, did you not?

23      A    What do you mean by "at will"?

24      Q    You understand that you can resign from your

25   position with the company at any time?

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                          Mario Richards

Page 68

1        A      That's correct.

2        Q      And you also understand that the company can

3    terminate your employment at any time?

4        A      That's correct.

5        Q      And you understand that you don't have any

6    type of contract of employment with CSC?

7        A      No, I don't understand that.

8        Q      Okay.  Are you aware of any signed contract

9    between you and CSC as to the length of your

10   employment?

11       A      I signed some things when I first was pulled

12   over from contractor to CSC employee, but I don't know

13   what they were.

14       Q      Okay.  No one ever guaranteed you that you

15   would be employed by CSC for a specific period of time,

16   did they?

17       A      Not verbally.

18       Q      Did anybody do that in writing?

19       A      I don't know.  I told you I didn't read the

20   documents.

21       Q      Okay.  You're not -- sitting here today

22   you're not aware of any written document in which CSC

23   promised to employ you for a specific period of time?

24              MR. MELLY:  Objection.  Form.  Is that

25   a statement or a question?

333402d5-0db0-4eea-b438-bdf42e69dc5a

Case 3:03-cv-00630-DJS     Document 40-3     Filed 10/14/2003     Page 5 of 56
Richards vs Computer Sciences Corp.

9/30/2003                                                              Mario Richards

Page 69

1              MS. SCHRETER:  Mr. Melly, if you're

2       going to continue interfering with this deposition I

3       will move for sanctions.

4              MR. MELLY:  Could we have that last --

5       whether it be a statement or question -- read back,

6       please?

7

8                    (The testimony was read.)

9

10             MR. MELLY:  I'll renew my objection to

11      form.

12      BY MS. SCHRETER:

13          Q     Are you aware of any --

14          A     I'm not aware of any document that I've

15      signed that states that.

16          Q     How did you become employed with CSC?

17          A     I first started working with CSC through

18      contractor RHI.

19          Q     And when was that?

20          A     My employment started the 26th of June,

21      2000.

22          Q     And who hired you?

23          A     Robin Beebe.

24          Q     Was she your supervisor once you became

25      hired?

Richards vs Computer Sciences Corp.

9/30/2003                                                          Mario Richards

Page 72

```
1      A    About two months.  Seven weeks, I think it
2  was.
3      Q    How long did you remain at Syracuse?
4      A    Seven weeks.
5      Q    And then what happened --
6      A    I was called back down to Norwich to work on
7  another account.
8      Q    What account did you work on while you were
9  up at Syracuse?
10     A    Carrier.
11     Q    And what was your job title?
12     A    I was in training to be a CSA.
13     Q    So about what time of year did you come to
14 Norwich?
15     A    About the second week of August 2000.
16     Q    And when you arrived here at Norwich, who did
17 you understand your supervisor would be?
18     A    Robin Beebe.
19     Q    And what account were you assigned to?
20     A    Sikorsky.
21     Q    And what training did you receive?
22     A    I was put with another CSA to learn the
23 account and the procedures on the account.
24     Q    Okay.  Do you remember who that CSA was?
25     A    Yes.  Eugene Pushefski.
```

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

Page 104

1    be discussing how she was paid?

2        A    She picked up my handle off the message

3    board.

4        Q    And what did she write to you about?

5        A    Basically she was working over 40 hours and

6    not getting paid for it.

7        Q    Did she tell you what her position was?

8        A    Yes.

9        Q    Okay.  What did she tell you her position

10   was?

11       A    Business analyst.

12       Q    Now, you've never worked for CSC as a

13   business analyst, have you?

14       A    No.

15       Q    Okay.  So you don't have any personal

16   knowledge of what the job responsibilities or duties

17   are of a business analyst, do you?

18       A    No.

19       Q    You've never worked for CSC as a system

20   administrator either, have you?

21       A    No.

22       Q    So you would have no personal knowledge about

23   the duties or responsibilities performed by somebody

24   who is a system administrator?

25       A    No.

Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

1       Q    Never worked as a system analyst either, have

2  you, at CSC?

3       A    No.

4       Q    So you don't know anything about the job

5  responsibilities that are performed by a systems

6  analyst, do you?

7       A    Not what CSC requires, no.

8       Q    And you've never worked at CSC as a systems

9  technician, either?

10      A    No.

11      Q    So you would have no personal knowledge of

12  what somebody does as a system technician at CSC?

13      A    Define system technician.

14      Q    Well, it's a job title that's at CSC.

15      A    Okay.

16      Q    I'm asking you.  You've told me you never

17  worked as a systems tech at CSC?

18      A    I never worked -- I mean, I was down at

19  Sikorsky for two days with desktop techs.  Are you

20  saying the same as a system techs?

21      Q    No, sir.  I'm asking about system tech.

22      A    System tech, no.

23      Q    So you would have no personal knowledge of

24  what a system tech does that's employed at CSC?

25      A    No.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                    Mario Richards

---

Page 106

1        Q      And you've never worked as a programmer

2    analyst at CSC, have you?

3        A      No.

4        Q      So you would have no personal knowledge about

5    the job responsibilities for that position?

6        A      No.

7        Q      And you've never worked as a software

8    engineer for CSC?

9        A      No.

10       Q      So again, you'd have no personal knowledge

11   about the job responsibilities for that position, would

12   you?

13       A      No.

14       Q      And you've never worked as an application

15   developer for CSC, have you?

16       A      No.

17       Q      And again, the same question.  You would have

18   no personal knowledge about the job responsibilities

19   performed by a person in that position?

20       A      No.   That's correct.

21       Q      And if I repeat one, tell me.  You've never

22   worked as a network administrator at CSC, have you?

23       A      No.

24       Q      So you would have no personal knowledge about

25   the job responsibilities performed by a person in that

---

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                              Mario Richards

Page 107

1    position?

2        A    No.

3        Q    And you've never worked as a network

4    engineer?

5        A    No.

6        Q    And you would not have any personal knowledge

7    about the job responsibilities performed by that

8    person, would you?

9        A    Not at CSC, no.

10       Q    Again, I'd like you to assume for the

11   purposes of this line of questioning that these are all

12   positions at CSC.

13       A    Okay.

14       Q    Now, you've never worked as a technology

15   architect at CSC, have you?

16       A    No.

17       Q    So you would have no personal knowledge about

18   what the job responsibilities or duties are that are

19   performed by somebody in that position, correct?

20       A    That's correct.

21       Q    And you've never worked as an information

22   system architect, have you, at CSC?

23       A    No.

24       Q    So again, you would have no personal

25   knowledge about the job responsibilities performed by

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                    Mario Richards

Page 108

1    that -- by a person in that position, would you?

2         A    No.

3         Q    And an information security technician at

4    CSC, you've never worked in that capacity, have you?

5         A    No.

6         Q    So again, you would have no personal

7    knowledge about what duties or responsibilities are

8    performed by a person in that position, correct?

9         A    That's correct.

10         Q    The final one I have is a telecommunications

11    technician.  You've never worked in that position at

12    CSC, have you?

13         A    No.

14         Q    So you would have no personal knowledge about

15    the job responsibilities or duties performed by a

16    person in that position, correct?

17         A    That's correct.

18         Q    You also don't know how any of these

19    individuals who hold these positions that I've just

20    listed to you, how those individuals are paid, correct?

21    Let me rephrase the question, if I can.

22         A    You're going to have to.

23         Q    I've listed in my last series of questions 12

24    positions.  I think my counts are correct on that.  For

25    any of those positions, do you have any personal

333402d5-0db0-4eea-b438-bdf42e69dc5a

Page 109

1    knowledge about how someone in those positions is paid

2    by CSC?

3        A    I don't know which specific positions, but

4    the majority of them, and this is before Mr. Fenter

5    came on board, are required to put in a minimum of 44

6    hours, that their time was expanded.

7        Q    That wasn't my question.  My question was:

8    You don't have any personal knowledge of how the

9    individuals who may hold these positions that I've

10   listed are paid by CSC, correct?

11       A    I don't know if they're included in that

12   thing.  And I understand when it went into effect, I

13   understood it was mostly CSC, and the help desk was not

14   included.  The help desk was the only one not included.

15   I will put that.

16       Q    I'm not asking about the hours these people

17   worked, do you understand that?

18       A    Okay.

19       Q    I'm asking you:  You have no personal

20   knowledge how the people in these positions are paid?

21       A    Whether hourly or salary, is that what you're

22   asking?

23       Q    Yes, sir.

24       A    Okay.  That would have been better phrased

25   that way.  Okay.  No, I don't.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences C\_\_.

Page 137

1   you've already told me?

2        A    No, that's incorrect.  They have developed a

3   Level II.

4        Q    You've never been a Level II, have you?

5        A    I'm going to go back and try to finish my

6   question -- my answer.  They have developed a Level II,

7   which the Level II they took out of the Level I people,

8   and some of the people were brought from site to do

9   Level II.

10            Basically Level II does the same job, except

11  they have more access to things that we don't have and

12  some of them have specific skills, but they don't just

13  do those specific jobs.

14       Q    You've never been a Level II CSA, have you?

15       A    No.

16       Q    You've never performed the duty -- all the

17  duties performed by a Level II CSA, have you?

18       A    Every one of the duties, no.

19       Q    So you do not have personal knowledge of all

20  the duties performed by a Level II CSA, correct?

21       A    Not each and every one of them, no.

22       Q    Which Level II CSAs have you worked with?

23       A    Tim Brennan, Laurie Patel, Julie Blasiak, I

24  think that's how you pronounce her name.  She's not

25  there any longer.  I can't remember them all.

Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                    Mario Richards

Page 138

1      Q     You've told me all the ones that you recall

2      right now?

3      A     That I can recall, yes.

4      Q     Okay.  And what you know about the job duties

5      that they've performed is based on what they've told

6      you, correct?

7      A     No.

8      Q     What's it based on?

9      A     It's based on -- there are some functions on

10     Level I that we were passing to Level II that I had a

11     gut feeling that I could resolve on first call at Level

12     I.  And if you want to call it behind the supervisor's

13     back or whatever, because they don't encourage them

14     coming down and teach us this stuff.  I had some of

15     them come over and show me how to do certain things.

16     Q     Okay.  Who did that?

17     A     Rich Lovell did it.

18     Q     And what did Mr. Lovell show you?

19     A     He showed me when a person is logging out of

20     their computer and they get the error message that

21     their profile storage is too large, he told me how to

22     reduce it.  It's a very simple procedure.

23     Q     So that's a procedure you can now do when you

24     get called?

25     A     I can now do.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                                      Mario Richards

Page 139

| | | |
|---|---|---|
| 1 | Q | Okay.  Have you had occasion to do it? |
| 2 | A | Plenty of times. |
| 3 | Q | All right.  Who else showed you things? |
| 4 | A | Laurie Patel. |
| 5 | Q | And what did Ms. Patel show you? |

6     A     Laurie Patel and Carrie Brooks both showed me

7   how to do Entrust.

8          Q     Tell me what that is.

9          A     When they're going to be sending some

10  classified documents from a contractor, from whether it

11  be Pratt -- well, right now Pratt is the only one I

12  understand has it, is they're going to be sending by

13  e-mail.  It's encrypted.  And there is a procedure that

14  we go through to allow them that encryption access for

15  a given period of time.

16         Q     Is that a duty that is performed by Level I

17  CSAs?

18         A     Two out of the -- there was only three people

19  in the whole shop that had it.  Two out of three of the

20  people were Level I.

21         Q     Okay.  So that was a skill that you

22  learned?

23         A     Yes.

24         Q     So are you now one of the CSAs -- the two

25  Level I CSAs that know how to do it?

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

Page 140

1      A     I know how to do it, yes.

2      Q     Who else knows?

3      A     Carrie Brooks.

4      Q     But she's a Level II?

5      A     No.

6      Q     She's a Level I?

7      A     Yup.

8      Q     Okay.  So she's not -- all right.  Laurie

9    Patel is what?

10     A     Level II.

11     Q     And Rich Lovell?

12     A     Level II.

13     Q     So the encryption is a duty that you didn't

14   have to have any special knowledge of what a Level II

15   does to learn it, you just had to have somebody teach

16   you, whether it was a Level I or a Level II?

17     A     Anything that Level II does is just a matter

18   of showing us and giving us the access.  Encryption,

19   the Entrust, you had to have access.  You had to submit

20   for an account.  Anybody could do it.

21     Q     Did you submit for an account?

22     A     Yes, I did.

23     Q     Were you granted that account?

24     A     Yes, I was.

25     Q     Now, again, I want to take you back to this

333402d5-0db0-4eea-b438-bdf42e69dc5a

9/30/2003                                                        Mario Richards

Page 141

1    whole issue of Level I versus Level II.  You've told me

2    you never worked as a Level II, that's right?

3        A    That's correct.

4        Q    And again, I want to clarify my understanding

5    that other than what Level IIs have told you that

6    they've been doing, you don't have any independent

7    personal knowledge of what Level IIs do?

8        A    Yes, I do.

9        Q    Okay.  What's that personal knowledge?

10       A    When I was on the account, Pratt & Whitney or

11   Sikorsky, I'd follow my tickets.  In other words, I got

12   a ticket and I get a hunch on something, and what I

13   would do is I jot that number down.  In the course of

14   the day or the next two or three days, I would go back

15   and research into that ticket and see what they did

16   because they put in the thing what it took to resolve

17   that issue.

18       Q    So you would be familiar from your review of

19   the tickets what the Level IIs did for those matters

20   that you referred up to them; is that right?

21       A    That's correct.

22       Q    You don't have any other personal knowledge

23   of what Level IIs do, do you?

24       A    Well, then I would take that ticket, if it

25   was something that I didn't understand, and I talked to

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

Page 142

```
 1    them.  Like I said, the supervisors do not -- and I

 2    can't say that word strong enough -- they do not let

 3    Level IIs show Level Is stuff, but people were showing

 4    me things.

 5         Q    What's your basis for that claim?

 6         A    Because they have specifically stated it.

 7         Q    Who's told you that?

 8         A    Robin Beebe.

 9         Q    And --

10         A    I have been over to Level II area and Robin

11    Beebe has chastised for me to go over to Level II area

12    when I've got a question.

13         Q    And that's because you're not supposed to be

14    out of your work area, correct?

15         A    No, it's not because of that.  It's because

16    I'm going over and picking up something now that no

17    longer will be passed up to Level II, it will stay at

18    Level I and it can be resolved.

19         Q    I want to make sure I understand specifically

20    what Robin Beebe told you about being in the Level II

21    area.  Would you please relate that to me?

22         A    Yes.  She says, You don't belong here.  And

23    she told me that I'm not to know the knowledge that

24    they have.

25         Q    When did she tell you this?
```

333402d5-0db0-4eea-b438-bdf42e69dc5a

Page 143

1    A    I don't know specific dates.

2    Q    Was it this year?

3    A    Oh, yes.

4    Q    Was it this month?

5    A    No.

6    Q    Was it last month?

7    A    No, because I'm no longer on that account.

8    Q    Okay.  What account is this?

9    A    It was UTC account.  I was working Pratt and

10   Sikorsky.

11   Q    And what account are you working on now?

12   A    I'm working on the Saint Vincent's account.

13   Q    And that's because you improperly gave out a

14   password, correct?

15   A    Yes.

16   Q    And because you didn't follow the proper

17   protocol for giving out that password, correct?

18   A    I think that addresses the previous question.

19   Yes, because I improperly gave out a password.

20   Q    You didn't follow the proper procedure for

21   doing so?

22   A    Okay.  Yes.

23   Q    You're not aware of anyone else that's done

24   that, are you?

25   A    Yes, I am.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                        Mario Richards

Page 144

1       Q    Okay.  Who else has done it?

2       A    Michael Thompson has done it.

3       Q    Okay.  You don't have any evidence that any

4   supervisor's aware of the fact that Mr. Thompson did

5   it?

6       A    Yes, I do.

7       Q    What supervisor was aware?

8       A    I don't know.  You'd have to ask Michael

9   Thompson.  But Michael Thompson, there is a number of

10  people that have done the same thing.  They've called

11  them in the back room, chewed them out, sent them back

12  to work.

13      Q    Okay.  Who chewed out Michael Thompson?

14      A    I don't know which supervisor he had at the

15  time.

16      Q    How do you know that Michael Thompson had

17  done it?

18      A    Because he told me.

19      Q    When did he tell you?

20      A    Shortly after I came back from admin leave.

21      Q    You never told anybody in management about

22  that, did you?

23      A    I was called in by a manager.

24      Q    No, sir.  I'm asking you --

25      A    I never told anybody, no.

333402d5-0db0-4eea-b438-bdf42e69dc5a

1      Q      And what is your understanding of exactly

2   what Mr. Thompson did?

3      A      He gave out over the phone, which is contrary

4   to policy, a password.  And he did not verify who the

5   person was.

6      Q      Okay.  Well, you not only gave out a password

7   to somebody over the phone, you gave out a password,

8   you changed the password for somebody else who wasn't

9   on the phone; is that correct?

10     A      That was his statement yesterday.  No, that's

11  not correct.

12     Q      Well, tell me exactly what you did.

13     A      All right.  I got a call from a gentleman on

14  the phone and the password, just as a matter of

15  information, is what they call a CASS password,

16  C-A-S-S.  It's an acronym for something I can't recall

17  right now.  It's an HR password.

18            Basically what happened is I got a party on

19  the phone and he needed his CASS password reset.  So I

20  sent that to his e-mail account.  And that is the

21  procedure, okay, because only he can open up his

22  e-mail; he's got the password for it.  Then he says,

23  I've got a buddy here.  And I says, Let me talk to him.

24  And I told him, I said, Okay.  Listen.  I'm going to

25  create a password for you and I'm going to send you the

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                          Mario Richards

Page 146

1    password on your e-mail.  He started giving me an

2    argument.

3              He says, My e-mail don't work.

4              I said, Okay.  No problem.  We'll set up your

5    e-mail right now on that computer.  And he started

6    giving me an argument, didn't have time, and everything

7    else.  Borderline to the point that he was starting to

8    use vulgarity.  Wasn't using it, but borderline.

9              So at that point I gave him a password.  I

10   didn't create the password, I gave him a password just

11   to get him off the phone.

12   Q    What's the difference?

13   A    The difference is, is going into the system

14   and putting his name in there and it generates a string

15   of alphanumeric characters.  With that string, they can

16   log in and immediately prompts them to change the

17   password to something that's personal for them.  I gave

18   him an alphanumeric string that was not generated.

19   Q    You never told anyone that you did that, did

20   you?

21   A    No.  To continue the statement.  At the

22   company, it doesn't matter right or wrong, it's what

23   they think and that's it.  I had a supervisor who I had

24   written up and had been told to stay away from me by

25   the former senior manager.  She had been told to say

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                    Mario Richards

Page 152

1    Wilma.

2        Q    So Wilma told you that Robin was lying?

3        A    Wilma told me that the three statements were

4    identical.  And Robin said, If anything in your

5    statement was even close to what they were saying, I

6    would believe it.

7        Q    What was the ultimate outcome of this

8    incident?

9        A    That was it.  Boom.  That was it.

10       Q    You were never counseled?

11       A    No.

12       Q    Have you ever been counseled during your

13   employment with CSC because of your behavior?

14       A    Yes, I have.

15       Q    In fact, you received a final written warning

16   back in March of 2001, didn't you?

17       A    Yes, I did.  No, it was prior to March 2001.

18   It was before I was a permanent employee.  Because they

19   held me back for a week or two from permanent employee

20   because of the counseling.

21       Q    When did you become a full-time employee of

22   CSC?

23       A    I don't know.  You got the dates here.  It

24   was sometime in February.

25       Q    Of 2000?

Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                      Mario Richards

Page 153

1      A    Yes.  Let's see.  What are the dates on this?

2  That's April.  That's 2/19.  Here's 3/2.  I don't know.

3  Well, here's the first one here.  The earliest date

4  that you can see is 2/19 on this use of computers.

5  They don't give those to contractors.

6              MS. SCHRETER:  Let me mark these if I

7  can, please.

8      A    But it was somewhere around the middle of

9  February of 2001.  Excuse me, not 2000.  2001.

10  BY MS. SCHRETER:

11     Q    Let me ask you to stop speaking.  I want the

12  court reporter to mark a couple of documents and she

13  can't do that while you're talking.

14

15              (Defendant's Exhibits 6 and 7:  Marked

16                   for identification.)

17

18  BY MS. SCHRETER:

19     Q    Mr. Richards, I'll show you what has been

20  marked as Defendant's 6 and 7.  Do you recognize those

21  documents?

22     A    I recognize this one here, 7.

23     Q    Okay.  And that's your signature at the

24  bottom of Exhibit 7?

25     A    Yes, it is.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

Page 154

1        Q    And do you recognize Exhibit 6?

2        A    I don't recognize it.

3        Q    Is that your signature at the bottom?

4        A    Yes, it is.

5        Q    Okay.  Do you recall in -- that you were

6    suspended on April 10th and 11th of 2002 for

7    unprofessional and disrespectful behavior?

8        A    Yes, I do.

9        Q    And do you also recall on March 19th, 2001

10   you were issued a final warning?

11       A    Yes, I do.

12       Q    For unsatisfactory conduct?

13       A    Yes.

14       Q    And that dealt with your inability or

15   unwillingness to work harmoniously with others?

16       A    That's what they billed it as, yes.

17       Q    So you're aware that this was made a part of

18   your permanent file?

19       A    Yes.

20       Q    Now, you never submitted any written comments

21   in response to either one of those disciplinary

22   actions, did you?

23       A    No.  I never knew that I could.

24       Q    Never consulted with anyone about it, did

25   you?

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                                Mario Richards

Page 157

1        A    No.

2        Q    Okay.  Now, the records that we have from CSC

3    indicate that you started there on February 19th, 2001.

4    Do you have any reason to dispute that date?

5        A    I could swear that from this one, when this

6    one was signed, I was still a contractor.

7        Q    But if CSC's records were to show that you

8    were an employee as of February 19th, 2001, you would

9    have no reason to dispute that, would you?

10        A    No.

11        Q    Have you now told me all of the personal

12    knowledge that you have as to what the Level II CSAs

13    do?

14        A    Yes.  I believe so.

15        Q    And there aren't any documents that you could

16    refer to that would help refresh your recollection or

17    your memory about any other personal knowledge that you

18    would have?

19        A    Well, I do have other personal knowledge.

20    Yes, I do have one other thing.  As Level IIs are --

21    they split them up in a day where like one day so many

22    will do it and so many won't.  They put them into a

23    split.  The split means a phone code where if you dial

24    in. -- like he mentioned 9 yesterday was Pratt &

25    Whitney.  I don't know what all the phone codes are,

Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                      Mario Richards

Page 163

1    after I was pulled back I didn't say another word.

2        Q    When you were going over the cube, tell me

3    exactly what you said to him.

4        A    I don't remember.

5        Q    Something about going outside?

6        A    Paraphrased, yes.

7        Q    Who pulled you off of him?

8        A    Wilma.

9        Q    Now, your primary duty as a Level I analyst

10   is to come up with solutions for -- to the client's

11   technical problems, correct?

12       A    That's correct.

13       Q    And in order to do that, you've got to gather

14   the facts from the person that you have on the phone,

15   correct?

16       A    That's correct.

17       Q    And then decide what you're going to do and

18   advise them to fix the problem; is that right?

19       A    You got to decide how you're going to

20   approach the problem.

21       Q    Okay.  Explain that to me.

22       A    You're on the thing, Saint Vincent's for

23   instance.  I can't get into Invision.

24       Q    Tell me what Invision is.

25       A    Invision is an application for registered

Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                      Mario Richards

Page 166

1    problem, these are the things you have to go through.

2    Every time start at square one and work the way up.

3        Q    And you have different solutions and

4    different questions you have to ask people depending on

5    the problem they tell you about?

6        A    Yes.

7        Q    And would it also be fair for me to say that

8    you've got to translate fairly complicated technical

9    terms into laymen's terms?

10       A    Not so much -- are you talking about explain

11   to the user what's going on?

12       Q    Yes.

13       A    They don't want to hear it.

14       Q    Okay.

15       A    Fix it.

16       Q    You have to tell them how to do something?

17       A    Yes.

18       Q    All right.  That may involve conveying to

19   them a technical concept necessary for them to do

20   something?

21       A    Yes.

22       Q    And you'd agree with me that it's critical to

23   CSC's relationships with its different clients that you

24   do this effectively?

25       A    Not only effectively, but you got to do it in

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                                    Mario Richards

Page 167

1    such a way -- the first thing they qualify themselves,

2    I'm not computer literate.  I say, Don't worry about

3    it.  You got to get that fear out of them.  That's the

4    first thing you've got to do.  Sometimes I'll slide a

5    joke in real quick, you know, and just to get their

6    mind off the problem.  And so now they can think they

7    can work with me.  So you got to do it in such a way.

8    And I tell them, Don't worry about it.  We're going to

9    solve this.  And I take each call as if I'm going to

10   get a solution for it.

11        Q    Okay.  So you have to develop a relationship

12   with the person on the other side of the phone?

13        A    And you may never talk to them again and

14   you've got to do it.

15        Q    Okay.  Is it fair for me to say that you

16   gather the information from the person, you have to

17   analyze the information, which may be incomplete?

18        A    Uh-huh.

19        Q    And then make a recommendation to that person

20   on what they should do, is that fair?

21        A    Yes.

22        Q    And that's your primary job, isn't it?

23        A    Just to do that?

24        Q    Yes.

25        A    No.  It's also resolution, if we can do it.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

Page 168

1      Q      Thank you.  Okay.  So all those things

2    combined together, that's your reason for being as a

3    CSA, isn't it?

4      A      I don't know that that's all our thing.

5    That's what our job is.

6      Q      You'd agree with me that's your primary job?

7    I understand there are other things you have to do, but

8    that's your primary job?

9      A      There is a lot of things you've got to do to

10   get to that point.

11     Q      I understand there may be steps in between.

12   What I'm trying to do is come up with a general

13   overview of what your primary job is.  And would you

14   agree that that's accurate what you've just told me?

15     A      And did we include documentation?

16     Q      Okay.  No.  Tell me about the documentation.

17     A      All right.  What we have to do is whatever I

18   put that person through, I put it in the thing.  Now,

19   if they come up with a -- say they come up with a -- I

20   might skip a lot of stuff to expedite the call to get

21   them -- because they're doctors or nurses, they ain't

22   got time to be waiting for me to type a lot of stuff

23   in, so I might leave out a lot of information in the

24   beginning.  But say, for instance, they call me up and

25   they say, Primary ID is zero.

333402d5-0db0-4eea-b438-bdf42e69dc5a

Page 169

1        Q      What's that?

2        A      Can't be found.  That could go from the

3   motherboard to the ribbon cable that connects to the

4   motherboard to the hard drive.  It could be one of

5   three things.  Now I've skipped all the steps I've done

6   up to that point.  And I put, User gets this on the

7   screen, and I put it right there.  So now why should I

8   have to say I looked to see if the light was green?

9   Had the user look to see if it's green.  This is what

10  it boils down to, three items.  Then the user has to

11  go -- the tech has got a clue now as to what's going

12  on.

13       Q      Okay.  So if I understand correctly with

14  respect to the documentation, you have to decide what's

15  going to be important for the person who may review

16  this ticket later on?

17       A      Yes.

18       Q      That's going to be critical things?

19       A      Yes.

20       Q      Not necessarily everything that you did?

21       A      And beyond that, I was a tech.  I worked for

22  Hallmark Inacom at Pratt & Whitney in East Hartford.

23  So the thing is is that I relate in that ticket as a

24  tech.  Someone with experience.

25       Q      And you use that experience every day as a

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                    Mario Richards

Page 348

1        A    Yes.

2        Q    Do you remember when you testified earlier

3   today about a memo from Steve Fenter?  Do you recall

4   that testimony?

5        A    Yes, I do.

6        Q    Is that that memo?

7        A    I have to read this.  Yes.  This is the

8   memo.

9        Q    You haven't received any other memo from Mr.

10  Fenter in that regard, have you?

11       A    No, I have not.

12       Q    Would you tell me each and every current or

13  former CSC nonexempt employee who you believe is

14  similarly situated to you with respect to your claims

15  under the Fair Labor Standards Act?

16       A    All of the CSAs in Norwich.

17       Q    Anybody else?

18       A    That I'm aware of?

19       Q    Yes, sir.

20       A    No.  Not as yet.

21       Q    And the reason you believe they are similarly

22  situated is because they hold the same job title that

23  you do?

24            MR. MELLY:  Objection as to form.

25       A    If I may answer --

333402d5-0db0-4eea-b438-bdf42e69dc5a

Page 349

1                    MR. MELLY:  Also calling for a legal

2       conclusion.  That's up to Judge Squatritro to

3       determine.

4                    MS. SCHRETER:  Would you repeat the

5       question, please?

6

7                    (The testimony was read.)

8

9       A     I'm not -- it would not be fair to the

10      question and if you're truly trying to search for the

11      answer with a yes or no.

12      BY MS. SCHRETER:

13      Q     Answer my question.  I'm not asking you to

14      answer it with a yes or no.

15      A     I believe that all the people on the Level I

16      and the Level II do basically the same job,

17      notwithstanding access, okay, or client.  They do the

18      same job.  They work under the same conditions.

19      Q     You've only worked at the Norwich facility,

20      correct, since you've been a CSC employee?

21      A     Since I've been a CSC employee.

22      Q     Okay.  And is there any other reason you

23      believe the CSAs at Norwich are similarly situated to

24      you with respect to your claim under the Fair Labor

25      Standards Act, other than what you've told me?

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                    Mario Richards

Page 350

1      A      Again, they work under the same conditions,

2   the same rules, same manager, and he sets rules for

3   everybody.

4      Q      Okay.  There are different team managers,

5   correct?

6      A      Yes, there are.

7      Q      And you've only worked since you've been a

8   CSC employee on three accounts, correct?

9      A      Since I've been a CSC employee, yes.

10     Q      All right.  So you're not familiar with the

11  service levels or the contract requirements for other

12  clients at CSC at this time, are you?

13     A      I don't think I understand what you're

14  getting at.

15     Q      Well, every client has its own requirements,

16  correct?

17     A      Are you talking about the contract the client

18  has with CSC?

19     Q    Yes.

20     A      I don't get into any of that contracts.

21     Q      So you don't know what are the different

22  kinds of inquiries that are received on other clients

23  or what is required by the company in terms of

24  responding to those clients, do you?

25     A      Basically the things that I've stated in

333402d5-0db0-4eea-b438-bdf42e69dc5a

Richards vs Computer Sciences Corp.

9/30/2003                                                      Mario Richards

Page 357

1                    STATE OF CONNECTICUT

2       I, Bethany A. Carrier, LSR 071, a Notary Public,

3    duly commissioned and qualified in and for the State of

4    Connecticut, do hereby certify that pursuant to Notice,

5    there came before me on the 30th day of September,

6    2003, the following-named person, to wit:

7    MARIO RICHARDS, who was by me duly sworn to testify to

8    the truth and nothing but the truth; that he was

9    thereupon carefully examined upon his oath and his

10   examination reduced to writing under my supervision;

11   that this deposition is a true record of the testimony

12   given by the witness.

13       I further certify that I am neither attorney nor

14   counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is

16   taken, and further that I am not a relative or employee

17   of any attorney or counsel employed by the parties

18   hereto, or financially interested in this action.

19       IN WITNESS THEREOF, I have hereunto set my hand

     this _3rd_ day of _OCTOber_____, 2003.

20

21

                    _Bethany Carrier_____

22                      Bethany A. Carrier

                         Notary Public

23

24   My Commission Expires:

     October 31, 2003

25

Brandon Smith Reporting Service

333402d5-0db0-4eea-b438-bdf42e69dc5a

10/1/2003                                    Mario Richards ( Volume II )

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                    \*
MARIO RICHARDS,                     \* CIVIL ACTION NUMBER
          PLAINTIFF,                \* 303CV00630(DJS)
                                    \*
vs.                                 \*
                                    \*
COMPUTER SCIENCES CORPORATION,\*
          DEFENDANT.                \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*     **COPY**
                    VOLUME II

----------------------------------------------------
          DEPOSITION OF:  MARIO RICHARDS
----------------------------------------------------

          Taken before Sarah B. Najemy, Licensed
Shorthand Reporter (#00069) and Notary Public
in and for the State of Connecticut, pursuant
to the Federal Rules of Civil Procedure, at the
law offices of Jackson Lewis, LLP, 55 Farmington
Avenue, Hartford, Connecticut, on October 1,
2003 at 10:40 a.m.

BRANDON SMITH REPORTING SERVICES
          44 Capitol Avenue
          Hartford, CT 06106
     Tel:  (860) 549-1850
     FAX:  (860) 549-1537

4f9ffe46-f2c4-41bc-a914-65cfa2caec3b

Richards vs Computer Sciences Corp.

Page 366

| | | |
|---|---|---|
| 1 | Q | How often do you get a situation with an |
| 2 | | incoming call from a client where you are unable |
| 3 | | to resolve the issue, or the problem, by using |
| 4 | | the knowledge base? |
| 5 | A | Are you looking for a percentage of calls? |
| 6 | Q | Yes.  A rough percentage, or number, whatever is |
| 7 | | easier for you in order to answer the question. |
| 8 | A | The issues that we can't resolve, I would say |
| 9 | | that we don't have the ability to resolve, I'd |
| 10 | | say a good 40 percent of our calls. |
| 11 | Q | Can't resolve with the knowledge base, that's my |
| 12 | | question. |
| 13 | A | That's correct.  Yes. |
| 14 | Q | What do you do with those calls? |
| 15 | A | Different accounts handle them different ways. |
| 16 | | Do you want me to explain what the accounts do? |
| 17 | | There's two basic ways they handle it. |
| 18 | Q | Okay.  Explain the two basic ways. |
| 19 | A | UTC basically has a second level that when you |
| 20 | | can't solve it, you can do what they call a hot |
| 21 | | hand-off.  Which means that you dial this |
| 22 | | number, and if somebody is available on the |
| 23 | | second level, they will pick it up.  And then |
| 24 | | you can transfer it immediately to them while |
| 25 | | the user is on the phone.  If the line is busy, |

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

Page 367

| | | |
|---|---|---|
| 1 | | then you just assign it to the second level |
| 2 | | queue. |
| 3 | | The other method which one now does, is |
| 4 | | when you can't resolve it, you have -- we're in |
| 5 | | Norwich -- basically the account is in the five |
| 6 | | boroughs of New York.  So, when we can't solve |
| 7 | | it, we have to send it to the appropriate queue, |
| 8 | | depending on the borough, and what the problem |
| 9 | | is. |
| 10 | Q | And is that the Saint Vincent account? |
| 11 | A | That's the Saint Vincent account. |
| 12 | Q | And when you send it off to the appropriate |
| 13 | | queue, would that be level two? |
| 14 | A | Well, actually, there's a middleman between |
| 15 | | that.  The organization is called Work Flow. |
| 16 | | And what they do is, they evaluate the ticket. |
| 17 | | They double check that all of our information is |
| 18 | | correct, that it's assigned to the right queue. |
| 19 | | Then they assign the tech -- the person who's |
| 20 | | going to go up there and look at the issue. |
| 21 | Q | That queue would be down in one of the five |
| 22 | | boroughs? |
| 23 | A | Yes. |
| 24 | Q | So, the differences between Saint Vincent and |
| 25 | | other accounts where you have the hot hand-off |

Richards vs Computer Sciences Corp.

10/1/2003                                              Mario Richards ( Volume II )

Page 368

```
 1        or the level two queue is that you send the
 2        queue on the Saint Vincent accounts down to one
 3        of the boroughs?
 4    A   That's correct.
 5    Q   In taking your incoming troubleshooting calls,
 6        do you yourself create solutions to the users'
 7        problems?
 8    A   No.
 9    Q   What is the difference between a level one and
10        a level two customer support analyst?
11    A   Basically, the big difference is access.
12    Q   You're a customer support analyst, right?
13    A   That's correct.
14    Q   A CSA?
15    A   Yes.
16    Q   Explain what you mean when you say access?
17    A   There are certain things that the client will
18        only allow a few people to have.  They won't let
19        them have permissions, or access, whatever you
20        want to call it, into certain things.  For
21        instance, a user calls up and says, "I was just
22        in this document this morning.  And I was
23        editing the document.  Now when I bring up the
24        document it says read only."  I don't have the
25        access to go in and change the permissions.  So,
```

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

10/1/2003                                    Mario Richards ( Volume II )

Page 369

| | | |
|---|---|---|
| 1 | | I have to send it up to second level.  They go |
| 2 | | in and they change the permissions -- rather |
| 3 | | than change permissions, they go in and make the |
| 4 | | access available to the user.  Or, they change |
| 5 | | the permissions, whatever they do.  I'm not |
| 6 | | sure. |
| 7 | Q | In handling a troublshooting call, such as the |
| 8 | | one you just described, about an access that |
| 9 | | level one did not have that would have been |
| 10 | | referred to level two, does the level two person |
| 11 | | follow the same procedure with the knowledge |
| 12 | | base that a level one would do in handling an |
| 13 | | issue? |
| 14 | A | Yes, they do. |
| 15 | Q | Are the level two people required to use the |
| 16 | | knowledge base just as the level one people? |
| 17 | A | Yes, they are. |
| 18 | Q | Are the level two analysts required to have more |
| 19 | | education than the level one analysts? |
| 20 | A | No.  It makes no difference. |
| 21 | Q | Why would a level two person have access to a |
| 22 | | certain application, where a level one person |
| 23 | | would not have that access? |
| 24 | A | That wouldn't have anything to do with me.  I |
| 25 | | wouldn't be able to even answer that.  Only in |

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

10/1/2003                                                    Mario Richards ( Volume II )

Page 396

```
 1    A    The clock on the computer, from what we have

 2         been told, is governed by the server.  I don't

 3         know what governs the time on the phone.  And

 4         real time as you come into the work is also

 5         different.  The clocks on the walls are

 6         different.  So, in all four instances none of

 7         them match.

 8    Q    Are you a part of management at CSC?

 9    A    No.

10    Q    Do you take part in management meetings with

11         Mr. Fenter?

12    A    No.

13    Q    Are you given the opportunity, or ability, to

14         alter policies at CSC?

15    A    No.

16    Q    Do you supervise anybody at CSC?

17    A    No.

18    Q    Are you under the direction of a supervisor, or

19         supervisors, at CSC?

20    A    Constantly.

21    Q    Constantly?

22    A    Yes.

23    Q    All day long?

24    A    All day long.

25    Q    Do you ever work with other analysts in the
```

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

Page 397

1         resolution of an issue that you are working on,

2         or issue they're working on, in the

3         troubleshooting functions?

4    A    We are not permitted to do so.  I had done it in

5         the past and gotten chastised for it.

6    Q    What happens in the situation at CSC if you are

7         at another analyst's cubical discussing work?

8    A    Basically a supervisor will come up to you, they

9         will let you know what is on their mind.  They

10        will tell you you are not supposed to be doing

11        this, and to get back to your cube.  And they

12        really don't care who's around who overhears it.

13   Q    Do you consider yourself as being advanced in

14        your field of information technology?

15   A    No, I don't.

16   Q    How would you describe your position as an

17        analyst as compared to other positions in the IT

18        industry?

19   A    In the industry, or at CSC?

20   Q    At CSC.

21                    MR. PAINDIRIS:  Could you repeat the

22             question, please?

23                    THE WITNESS:  Yes.  Please.

24   BY MR. MELLY:

25   Q    How would you describe your position as an

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

Page 442

```
 1          without having to consult the knowledge base?

 2     A    Are you asking me to assume -- that when I'm

 3          doing something like this that I can assume I

 4          know the procedure?

 5     Q    No.  I'm asking you whether you, in fact, know

 6          how to resolve any customer problems without

 7          consulting the knowledge base?

 8     A    One of the reasons for consulting the knowledge

 9          base is they make changes and they don't notify

10          you.  So, yes, you have to refer to the

11          knowledge base each and every call to be able to

12          apply any changes that have been made.

13     Q    When you say that you use the knowledge base on

14          every call, in what way do you use it?

15     A    You pull up the particular issue and you read

16          the written document as to steps that you have

17          to follow.

18     Q    Is it your belief that any person off the street

19          could use the knowledge base and resolve the

20          calls that you receive on a day-to-day basis at

21          CSC?

22     A    Yes.

23     Q    You don't have any firsthand knowledge, do you,

24          of to what extent the other CSA level ones use

25          the knowledge base?
```

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

10/1/2003                                                    Mario Richards ( Volume II )

Page 443

```
 1                    MR. MELLY:  Objection to form.
 2                    THE WITNESS:  Rephrase it as a
 3          question, please.
 4    BY MR. PAINDIRIS:
 5    Q    It was a question.  Did you understand it?
 6    A    It seemed like it was a statement.
 7    Q    Is was not a statement.  Do you understand the
 8         question?
 9    A    No.
10    Q    What don't you understand about it?
11    A    The home makeup of the question -- or the
12         phrase.
13    Q    Let's have it read back, please.
14                    (* Question read)
15    A    It seems like you put a question inside of a
16         statement.  Rephrase it as a question.
17    Q    Mr. Richards, it is a question.  Do you
18         understand it, or not?
19    A    I don't understand it to be a question, no, I
20         don't.
21    Q  * Okay.  You don't have any firsthand knowledge of
22         how much the other CSAs use the knowledge base,
23         do you?
24    A    Again, "you don't have any."  Do you have any?
25    Q    Mr. Richards, answer my question.
```

Brandon Smith Reporting Service

4f9ffe46-f2c4-41bc-a914-65cfa2ceeec3b

Richards vs Computer Sciences Corp.

10/1/2003                                          Mario Richards ( Volume II )

Page 444

1    A    I'm trying to answer a question.  But I'm trying
2         to have it presented as a question.

3    Q    It was presented as a question.

4    A    It was presented as a statement.  It's not asked
5         as a question looking for an independent answer.
6         It's posed to me as a statement of what I'm
7         supposed to say back to you.

8    Q    Mr. Richards, in the eyes of the court what I
9         just asked you is a question.  And I don't think
10        your attorney would disagree.  Now, will you
11        please answer the question?  If you want it read
12        back to you, we can read it back to you again.

13   A    I want to write it down.

14   Q    Sure.  I will give you a pad.

15                    (* Question read)

16   A    That is something that they would have to
17        answer.  I don't know the answer.

18   Q    Now, you testified earlier today that you do not
19        have any part in creating the procedures in the
20        knowledge base, is that correct?

21   A    Yes, that's correct.

22   Q    Do you have the opportunity to submit
23        information for the knowledge base?

24   A    I have the opportunity.

25   Q    You do have that opportunity?

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

Page 445

| 1 | A | I have that opportunity. |
| 2 | Q | Okay.  And you don't have any firsthand |
| 3 |   | knowledge of whether any other CSAs have |
| 4 |   | submitted information to the knowledge base, do |
| 5 |   | you? |
| 6 | A | No, I don't. |
| 7 | Q | Other than the security issue that was discussed |
| 8 |   | earlier today and yesterday, where I believe you |
| 9 |   | claim that you were suspended regarding some |
| 10 |   | security issue; do you know what I'm talking |
| 11 |   | about?  If not, please tell me and I will try to |
| 12 |   | be clear. |
| 13 | A | Yes, I know what you're talking about. |
| 14 | Q | Other than that, were there any other times |
| 15 |   | where you varied in any way from what's in the |
| 16 |   | knowledge base in your process of resolving a |
| 17 |   | call? |
| 18 | A | No. |
| 19 | Q | Do you have any firsthand knowledge of whether |
| 20 |   | any other CSAs ever varied from the procedures |
| 21 |   | in the knowledge base? |
| 22 | A | Could you be specific on firsthand knowledge? |
| 23 | Q | Are you aware of other CSAs who have varied from |
| 24 |   | the knowledge base? |
| 25 | A | Have I seen them do it, is that what you're |

4f9ffe46-f2c4-41bc-a914-65cfa2ceeec3b

Richards vs Computer Sciences Corp.

Page 446

1      asking?

2   Q   Are you aware of any that have?

3   A   Are you referring to just a security issue?

4   Q   No.  I'm asking you about any variation.

5   A   No, I have no firsthand knowledge.

6   Q   And in the incident that you described where you

7      varied from the knowledge base and were

8      suspended, isn't it true that that involved a

9      security issue regarding a password?

10  A   Yes.

11  Q   Now, you testified that you can't make changes

12     to the knowledge base, correct?

13  A   No, I can't.

14  Q   And you also testified that you have the

15     opportunity to submit information for the

16     knowledge base, correct?  Let me withdraw that

17     question.

18         Do you have any firsthand knowledge of

19     whether any CSA has submitted information to the

20     knowledge base and it has been actually put on

21     the knowledge base?

22  A   No.

23  Q   You don't know of any?

24  A   I don't know of any.

25  Q   Okay.  Is it possible that a CSA has done that?

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

10/1/2003                                      Mario Richards ( Volume II )

Page 451

| | | |
|---|---|---|
| 1 | A | I get e-mails when there's change controls, or a |
| 2 | | policy. But I also stated, too, today, that if |
| 3 | | there's a change in the knowledge base we are |
| 4 | | not necessarily informed of it. That's why we |
| 5 | | have to constantly go back to the knowledge base |
| 6 | | in case there has been a change. |
| 7 | Q | Isn't it true that there are some things handled |
| 8 | | differently on different accounts; for example, |
| 9 | | there are some things handled differently on |
| 10 | | Saint Vincent than on UTC? |
| 11 | A | I can't speak to all of UTC. |
| 12 | Q | You don't know how things are handled on all of |
| 13 | | UTC? |
| 14 | A | No. |
| 15 | Q | What part of UTC do you know about; Pratt? |
| 16 | A | Pratt. |
| 17 | Q | And Sikorsky? |
| 18 | A | Sikorsky. |
| 19 | Q | Just those two? |
| 20 | A | Yes. |
| 21 | Q | Okay. Are there some things handled differently |
| 22 | | on Pratt and Sikorsky than on Saint Vincent? |
| 23 | A | The procedures are basically the same. |
| 24 | Q | Are there things that are different? |
| 25 | A | No procedures are different. |

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

| 1 | Q | No procedures are different? |
| 2 | A | No. |
| 3 | Q | Didn't you testify earlier that UTC has a |
| 4 |   | different procedure for hand-offs than Saint |
| 5 |   | Vincent? |
| 6 | A | I said none of the UTC accounts, the procedures |
| 7 |   | from one business unit to the next within UTC, |
| 8 |   | is the same.  I thought I had made that clear. |
| 9 | Q | Okay.  Didn't you testify that on the UTC |
| 10 |  | account, if a level one can't resolve the |
| 11 |  | problem, you do what's called a hot hand-off to |
| 12 |  | level two? |
| 13 | A | That's correct. |
| 14 | Q | Do you do that at Saint Vincent? |
| 15 | A | No. |
| 16 | Q | Isn't that a different procedure? |
| 17 | A | I did a different account.  UTC is different. |
| 18 | Q | That was my question, Mr. Richards.  Are there |
| 19 |  | procedures that are different between the UTC |
| 20 |  | accounts, Pratt and Sikorsky, and Saint Vincent? |
| 21 | A | To the respect that when you can't resolve it, |
| 22 |  | how it's handled from there. |
| 23 | Q | So, that's an example of a procedure that's |
| 24 |  | different, correct? |
| 25 | A | I don't know if I would label it as a procedure. |

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

10/1/2003                                                    Mario Richards ( Volume II )

Page 453

| 1 | Q | What is it then? |
|---|---|---|
| 2 | A | I would say it's a different tool. |

3   Q   So, there are tools that are different between
4       the accounts?

5   A   Yes, there are.

6   Q   Okay.  You testified that you do not create
7       solutions to users problems, is that correct?

8   A   That's right.

9   Q   Do you have any firsthand knowledge of whether
10      other CSAs create solutions to users problems?

11  A   I have no firsthand knowledge.

12  Q   You testified that the access that level ones
13      and level twos have is different, correct?

14  A   Level two is different from level one.

15  Q   Now, is one of the ways that level two is
16      different from level one the access that they
17      have?

18  A   They have everything that level one has, in
19      addition.

20  Q   Is one of the ways that level two is different
21      from level one the access that they have?

22  A   That's one of the differences.

23  Q   Okay.  You gave the example earlier of a file,
24      that might be a read only file that a level two
25      might have access to but a level one would not,

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

Page 454

1        is that correct?

2    A   Not the file itself.  I'm not saying that he has

3        access to the file itself.

4    Q   Give me an example of a situation where a level

5        two has greater access than a level one.

6        Because I thought you were responding to

7        Attorney Melly's question earlier when you gave

8        that answer.

9    A   Okay.  As the example that I gave, you call up

10       and you say I was into a document and I was

11       editing it.  Now I try to get into it, I have

12       the permissions to go in and edit it.  It's

13       called a right to access.

14   Q   Who does?

15   A   You're a user.  You're calling in to me.  And

16       you say, "I was on this document 15 minutes ago.

17       I have read write access."  Which means they can

18       see the document, and they can write -- they can

19       edit the document, all right?  It might be an

20       Excell spreadsheet, whatever it is.  Now, you

21       tell me you're accessing it now, and you're

22       going in and you're trying to edit it, and it

23       says you have read only.  It's indicating to

24       that you that your permissions have changed.

25   Q   Okay.  So, that's an example of access.

Richards vs Computer Sciences Corp.

10/1/2003                                          Mario Richards ( Volume II )

Page 455

```
 1   A    Okay.  No.

 2   Q    Go ahead.

 3   A    I can't correct that problem.

 4   Q    Why not?

 5   A    Because I don't have the access to go in and

 6        resolve -- I don't have the access to go in to

 7        whatever it takes to release that so that you

 8        can edit it.

 9   Q    And why don't you have that access?

10   A    Because level one is not permitted to have it.

11   Q    So, in your example, a level two would have the

12        access to go into at that document and help that

13        user.

14   A    We send it to level two.  Whether it gets

15        resolved there or not, whether they have the

16        access to go in and get that person access to

17        that file or not, that I don't know.

18   Q    Well, when you said that level twos had

19        different access than level ones, I'm looking

20        for a specific example of where a level two has

21        different access from a level one.

22   A    You call in and you want a file backed up.  A

23        backup.  You lost your file.  You want to run it

24        from backup.  And you're asking for it to be

25        restored.  With the tools that I have and the
```

Page 458

```
 1          hearsay.  Nothing talking about it.  I don't
 2          watch what they do.
 3   Q      So, you don't know exactly how much a level two
 4          uses the knowledge base, correct?
 5   A      I know that level two is the same as level one.
 6          They're supposed to access the knowledge base
 7          with every call.
 8   Q      That's not what I asked you.  What I asked you
 9          is, you don't know how much the level twos use
10          the knowledge base, do you?
11   A      I'm not over there observing what they're
12          doing.  So, no, I don't have that.
13   Q      And you don't know how much education a level
14          two is required to have to work at CSC, do you?
15   A      Yes, I do know.
16   Q      How do you know that?
17   A      Because when you submit for the job you're
18          interviewed and selected and not based on
19          education.
20   Q      Have you ever interviewed and selected a level
21          two?
22   A      No.  I know level two people that only have high
23          school.
24   Q      How do you know they only have high school?
25   A      Because I have spoken with them.
```

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

Page 459

| | | |
|---|---|---|
| 1 | Q | So, based on what they told you? |
| 2 | A | Yes. |
| 3 | Q | And do you know what those -- those people that |
| 4 | | you spoke to, who only had a high school |
| 5 | | education, do you know what their prior |
| 6 | | experience was? |
| 7 | A | Based on their conversation with me? |
| 8 | Q | Do you know what their prior experience was? |
| 9 | A | I didn't know them prior to working for CSC. |
| 10 | Q | Do you know as you sit here today what their |
| 11 | | prior experience was? |
| 12 | A | Again, would be based on the conversation I had |
| 13 | | with them. |
| 14 | Q | Do you feel that you have that knowledge based |
| 15 | | on that conversation? |
| 16 | A | Based on that conversation, yes. |
| 17 | Q | So, based on that conversation you know exactly |
| 18 | | what they did before they came to CSC? |
| 19 | A | Yes. |
| 20 | Q | Because of what they told you? |
| 21 | A | That's what -- |
| 22 | Q | You have no other information other than what |
| 23 | | they told you? |
| 24 | A | That's correct. |
| 25 | Q | Have you ever gone from level one to level two? |

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

10/1/2003
Richards vs Computer Sciences Corp.

Mario Richards ( Volume II )

Page 460

```
 1    A    No.

 2    Q    So, how do you know how much training is

 3         involved to go from level one to level two?

 4    A    My conversations with level two people.

 5    Q    But you don't have any firsthand knowledge of

 6         that?

 7    A    I have not sat there and watched them, no.

 8    Q    When you testified about your response to

 9         Defendant's interrogatories, which is Exhibit

10         16, you testified that they were read and

11         explained to you; is that correct?

12    A    Yes.

13    Q    Who read them to you?

14    A    Attorney Melly.

15    Q    And was that done over the phone?

16    A    No.

17    Q    It was in person?

18    A    Yes.

19    Q    And you gave him your response verbally?

20    A    Yes.

21    Q    How do you know whether he accurately recorded

22         your responses -- withdrawn.  Did you review the

23         document after he recorded the responses you

24         verbally gave to him?

25    A    Again, I'm going to go into the word review.
```

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b

Richards vs Computer Sciences Corp.

10/1/2003

Mario Richards ( Volume II )

Page 483

```
1               CERTIFICATE OF REPORTER

2          I, Sarah Najemy, a Notary Public duly

3     commissioned and qualified in and for the State of

4     Connecticut, do hereby certify that pursuant to

5     Notice, there came before me, on the 1st day of

6     October, 2003, the following named person, to wit:

7     MARIO RICHARDS, who was by me duly sworn to

8     testify to the truth and nothing but the truth;

9     that he was thereupon carefully examined upon his

10    oath and his examination reduced to writing under

11    my supervision; that this deposition is a true

12    record of the testimony given by the witness.

13         I further certify that I am neither attorney

14    nor counsel for, nor related to, nor employed by

15    any of the parties to the action in which this

16    deposition is taken, and further that I am not a

17    relative or employee of any attorney or counsel

18    employed by the parties hereto, or financially

19    interested in the action.

20         IN WITNESS THEREOF, I have hereunto set my

21    hand on this 3rd day of October, 2003.

22    Sarah B. Najemy, _____

23    Notary Public, License No. (#00069)

24    My commission expires:  8/31/05

25
```

4f9ffe46-f2c4-41bc-a914-65cfa2ceec3b