# EXHIBIT A

Service: **Get by LEXSEE®**
Citation: **2004 U.S. Dist. lexis 24447**

*2004 U.S. Dist. LEXIS 24447, \*; 150 Lab. Cas. (CCH) P34,945*

ABRITTO EL, GARY CORONA, SHIRLEY THOMPSON, DEBBIE FAUCHER, BARBARA RANSOM-PRICE, ALFONSO WILLIAMS, FRANKLIN SIMS, DERRICK REDDICK, ELESHA SMALLS, RICARDO J. BERMUDEZ, WILLIAM KAREEM, JAMES PEREZ, DIANE JACKSON, VIDAL VELAZQUEZ, LAWRENCE DOCKERY, and HARRY WILSON, on behalf of themselves and all others similarly situated, Plaintiffs, v. JOHN E. POTTER, Postmaster General of the United States, Defendant.

01 Civ. 6125 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 24447; 150 Lab. Cas. (CCH) P34,945

December 6, 2004, Decided
December 13, 2004, Filed

**SUBSEQUENT HISTORY:** Corrected by, Motion denied by El v. Potter, 2005 U.S. Dist. LEXIS 4330 (S.D.N.Y., Mar. 10, 2005)

**DISPOSITION:** Defendant's motion for summary judgment dismissing complaint granted in part an denied in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant, in his official capacity as Postmaster General of the United States, filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 to dismiss the collective action suit of plaintiff postal workers, which alleged violations of the federal Fair Labor Standards Act (FLSA), specifically 29 U.S.C.S. §§ 206, 207, and the New York State Minimum Wage Act (NYSMWA).

**OVERVIEW:** The workers challenged two policies implemented by the United States Postal Service: (1) the suspension of blanket, fixed 12-minute or 15-minute twice-daily wash-up periods for employees in one district; and (2) the relocation of clock-in and clock-out stations at a processing and distribution center (clock-in claims). The court held that the workers had failed to carry their burden of providing evidence that the Postal Service willfully or recklessly disregarded the FLSA by suspending blanket fixed wash-up during an impasse period between the Postal Service and the workers' union. Changing clock-in locations was not a willful FLSA violation. Thus, the two-year statute of limitations applied and did not stop running until a plaintiff opted into the suit. Because the first opt-in forms were filed on May 21, 2002, all claims based on conduct predating May 21, 2000 were time-barred. The clock-in claims were not de minimis because the record suggested that affected employees spent 20 to 30 minutes each day in transit within the processing facility to get to and from their work assignments. The unnamed plaintiffs were not barred by improper solicitation, and the NYSMWA was inapplicable.

**OUTCOME:** The court granted summary judgment to the postmaster general on the FLSA claims based on conduct predating May 21, 2000, on the liquidated damages claims based on the FLSA claims, and on the NYSMWA claims. The summary judgment motion was denied to the extent that it sought dismissal of the employees' clock-in claims on the

grounds that they were de minimis and to the extent that it sought dismissal of the FLSA claims of the unnamed plaintiffs.

**CORE TERMS:** wash-up, blanket, impasse, clock-in, summary judgment, notice, opt-in, statute of limitations, dirty work, arbitration, minute, collective action, liquidated damages, station, clock, written consent, work performed, manager, unilaterally, willful, tour, solicitation, arbitrator, distributed, elimination, reinstated, relocation, timecard, arbitration award, unnamed

### LexisNexis(R) Headnotes ♦ Hide Headnotes

Civil Procedure > Summary Judgment > Standards > Materiality

*HN1* Under Fed. R. Civ. P. 56(c), summary judgment is warranted when, in viewing the evidence in the light most favorable to the non-movant, a district court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(c).  More Like This Headnote

Civil Procedure > Summary Judgment > Standards > Appropriateness

Civil Procedure > Summary Judgment > Standards > Legal Entitlement

Civil Procedure > Summary Judgment > Standards > Materiality

*HN2* A motion for summary judgment requires the party with the burden of proof at trial to make a showing sufficient to establish the existence of an element essential to that party's case because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. Where the record taken as a whole could not lead a rational trier of fact to find for the moving party, there is no genuine issue for trial. Accordingly, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  More Like This Headnote | *Shepardize:* Restrict By Headnote

Evidence > Procedural Considerations > Burdens of Proof > General Overview

Governments > Legislation > Statutes of Limitations > Time Limitations

Torts > Procedure > Statutes of Limitations > General Overview

*HN3* The statute of limitations for a federal Fair Labor Standards Act (FLSA) claim is two years for a non-willful violation and three years for a willful violation. 29 U.S.C.S. § 255(a). An FLSA violation is willful if an employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the FLSA. Plaintiffs bear the burden of proving that an employer's conduct rises to the level of a willful violation.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Governments > Federal Government > U.S. Postal Service

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > General Overview

*HN4* ± The federal Fair Labor Standards Act (FLSA) expressly excludes wash-up time liability unless it is mandated by contract. 29 U.S.C.S. § 254(a),(b); 29 C.F.R. § 790.7 (g). More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > General Overview 🖫

Civil Procedure > Judgments > Preclusion & Effect of Judgments > Estoppel > Collateral Estoppel 🖫

Governments > Legislation > Statutes of Limitations > Time Limitations 🖫

*HN5* ± Collateral estoppel can be predicated on arbitration proceedings. A party is collaterally estopped from relitigating an issue if a four-part test is met: (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > General Overview 🖫

Civil Procedure > Class Actions > Opt-Out Provisions 🖫

Governments > Legislation > Statutes of Limitations > Time Limitations 🖫

*HN6* ± In a federal Fair Labor Standards Act (FLSA) collective action suit, the statute of limitations continues to run until a plaintiff files a written consent opting into the suit. A collective action suit begins for any individual plaintiff only: (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or (b) if such written consent was not so filed or if his name did not so appear -- on the subsequent date on which such written consent is filed in the court in which the action was commenced. 29 U.S.C.S. § 256. An FLSA collective action suit is not a typical class action subject to Fed. R. Civ. P. 23, in which a potential plaintiff is included as a class member unless he chooses to opt out of the class. A potential member of an FLSA collective action suit must expressly opt into the suit by giving his consent in writing to become such a party and such consent is filed in the court in which such action is brought. 29 U.S.C.S. § 216(b). Thus, all plaintiffs, including named plaintiffs, must file written consents in order to begin their lawsuits, and a suit does not begin until a consent has been filed. More Like This Headnote | *Shepardize: Restrict By Headnote*

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview 🖫

Civil Procedure > Alternative Dispute Resolution > Judicial Review 🖫

Labor & Employment Law > Collective Bargaining & Labor Relations > Impasse Resolution 🖫

*HN7* ± An arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached. More Like This Headnote

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Overtime & Work Period 🖫

Tax Law > Federal Income Tax Computation > Compensation & Welfare Benefits > Fringe Benefits (IRC secs. 61, 132) > General Overview 🖫

*HN8* There is a three factor test to determine whether otherwise compensable time should be considered de minimis and therefore not compensable. These factors are as follows: (1) the practicable administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis.  More Like This Headnote

Civil Procedure > Class Actions > Judicial Discretion

Civil Procedure > Class Actions > Notices

Labor & Employment Law > Wage & Hour Laws > Remedies > Class Actions

*HN9* A district court has a substantial interest in communications that are mailed for single actions involving multiple parties because although the collective form of action is designed to serve an important function, the potential for misuse of the class device, as by misleading communications, may be countered by court-authorized notice. Accordingly, although 29 U.S.C.S. § 216(b) of the federal Fair Labor Standards Act (FLSA) permits notice to potential plaintiffs in FLSA class action suits, only the court has the power to approve such notice. By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative. Both parties and the court benefit from settling disputes about the content of the notice before it is distributed. This procedure may avoid the need to cancel consents obtained in an improper manner. District courts have ruled that they have discretionary power to authorize the sending of notices to potential class members in a collective action brought pursuant to FLSA. The FLSA, on its face, is silent on the issue of notice to potential class members.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Civil Procedure > Class Actions > Judicial Discretion

Evidence > Procedural Considerations > Burdens of Proof > General Overview

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > General Overview

*HN10* The threshold issue in deciding whether to authorize a class notice in a federal Fair Labor Standards Act (FLSA) action is whether plaintiffs have demonstrated that potential class members are similarly situated. 29 U.S.C.S. § 216(b). Courts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law. Some courts have authorized class notices based solely upon the allegations contained in the complaint.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Judicial Officers > Judges > Discretion

Governments > Federal Government > U.S. Postal Service

Labor & Employment Law > Wage & Hour Laws > Remedies > General Overview

*HN11* Under 29 U.S.C.S. § 260, a district court has discretion to award no liquidated damages where an employer acted in good faith. The question of liquidated damages is determined by the court.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Governments > Federal Government > Executive Offices 

Governments > Federal Government > U.S. Postal Service

Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions > Governmental Employees

HN12 The New York State Minimum Wage Act (NYSMWA) excludes from coverage those people employed by a federal, state or municipal government or political subdivision thereof. N.Y. Lab. Law § 651(5)(n). This rule excludes United States Postal Service employees from the NYSMWA's coverage. The statutory designation of the Postal Service as an independent establishment of the executive branch of the government of the United States, 39 U.S.C.S. § 201, is not consistent with the idea that it is an entity existing outside the government. The statutory instruction that the Postal Service is an establishment of the executive branch of the government of the United States indicates just the contrary. The federal Postal Reorganization Act gives the Postal Service a high degree of independence from other offices of the government, but it remains part of the government. More Like This Headnote

**COUNSEL:** **[*1]** VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C. Attorneys for Plaintiffs, New York, NY. By: MAUREEN M. STAMPP, ESQ. Of Counsel.

HONORABLE DAVID N. KELLEY, United States Attorney for the Southern District of New York, Attorneys for Defendant, New York, NY. By: NICOLE GUERON, ESQ. Assistant US Attorney, Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION:**

**Sweet, D.J.,**

Defendant John E. Potter, in his official capacity as Postmaster General (the "Postmaster General") of the United States Postal Service (the "Postal Service"), has moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P., to dismiss the complaint of Abritto El ("El"), fifteen other named plaintiffs, and certain additional plaintiffs on their own behalf and in a class of other employees similarly affected (the "Plaintiffs"), alleging violations of the Fair Labor Standards Act ("FLSA") and the New York State Minimum Wage Act.

This action concerns two policies implemented by the Postal Service on May 4, 1996: (1) the suspension of blanket, fixed 12-minute or 15-minute twice-daily wash-up periods for employees in the New York District (the "wash-up claims"), **[*2]** and (2) the relocation of clock-in and clock-out stations at the Morgan Processing and Distribution Center (the "clock-in claims"). For the reasons set forth below, the motion is granted in part and denied in part.

**Prior Proceedings**

The complaint in this action was entered on July 9, 2001. The answer was entered on November 26, 2001. Discovery was completed on September 30, 2003. The defendant's motion for summary judgment was entered on January 29, 2004, and the motion was marked as fully submitted on April 28, 2004.

**The Facts**

Both the Postal Service and the Plaintiffs have submitted statements of fact pursuant to Local Rule 56.1 from which the following facts are drawn. Any disputed facts are noted.

## 1. The Wash-Up Claims

The Postal Service and the American Postal Workers Union (the "APWU" or the "Union") are bound by a national collective bargaining agreement known as the "National Agreement." Article 8, Section 9 of the National Agreement ("Article 8.9") provides that "Installation heads shall grant reasonable wash-up time to those employees who perform dirty work or work with toxic materials." Article 30 of the National Agreement provides [*3] that "presently effective local memoranda of understanding not inconsistent or in conflict with the 1994 National Agreement shall remain in effect during the term of this agreement unless changed by mutual agreement pursuant to the local implementation procedures set forth below or as a result of an arbitration award or settlement arising from either parties' impasse of an item from the presently effective local memorandum of understanding."

In New York, the Postal Service and its APWU-represented workers were bound by a Local Memorandum of Understanding (the "LMOU") which before 1996 provided for wash-up as follows: all APWU-represented employees would receive a fixed amount of wash-up time of either 12 or 15 minutes before lunch, and 12 or 15 minutes before the end of the work tour, depending on their work locations and responsibilities (called "blanket fixed wash-up").

In March 1996, the Postal Service and the Union negotiated the terms of the 1994-1998 LMOU. Before those negotiations, three members of the Postal Service's New York management -- district director Sylvester Black ("Black"), plant manager Vinnie Malloy ("Malloy"), and director of human resources August Sheridan [*4] ("Sheridan") -- concluded that the LMOU's blanket fixed wash-up was inconsistent with the "reasonableness" standard set by Article 8.9 and should be contested by management. Sheridan met with members of the Postal Service operations staff and identified those job functions that were more likely to be involved in dirty work and with what frequency. From those discussions, Sheridan developed lists of job functions, and divided them into the following three categories reflecting whether the nature of the job function would likely give rise to a need for wash-up: "usually not," "sometimes," and "more likely." These lists were ultimately distributed to Postal Service management to help managers assess when to grant wash-up requests.

The Postal Service brought the wash-up issue to the LMOU bargaining table, seeking to negotiate the blanket, fixed wash-up provisions.

Then Union-president Josie McMillian responded by declaring the wash-up issue "non-negotiable" and asserting that "Taking wash-up away is a discriminatory practice of Management. . . . I feel that because I'm a Black Woman and Management is White, this is a personal attack against me." (Gueron Decl. Ex. 2 at 4, 13.) The parties [*5] were unable to reach agreement on the issue of wash-up time, and they declared an impasse on or about April 1, 1996.

The impasse was appealed to local impasse arbitration pursuant to the National Agreement.

By letter dated April 9, 1996, the Postal Service informed the Union that effective May 4, 1996, and for the duration of the negotiation impasse period, it would no longer implement blanket fixed wash-up, and that "employees will be allowed reasonable wash-up time as provided for under Article 8 Section 9 of the National Agreement." On May 4, 1996, the Postal Service implemented the impasse period wash-up rules.

The Postal Service instructed its managers to follow Article 8.9 during the impasse period following May 4, 1996, stating that "the amount of wash-up time which is granted should

relate to the work performed by the employee. Time could vary with each request due to the fact that the work performed by different individuals and even the work performed by the same individual could vary from day to day and time of day." (Gueron Decl. Ex. 5 at 2.) The Postal Service also directed its managers that "this policy does not mean that there should be blanket denial of wash-up time. **[*6]** Rather, wash-up time should be granted consistent with the terms of Article 8 Section 9 of the National Agreement," (id.), and that wash-up time was to be used for washing up only; employees were not to be permitted to get coffee, change clothes or wait by the time-clock during the wash-up period.

Black testified that "our policy was that if you need to wash up you were allowed to wash up. If you were engaged in dirty work then you were allowed to use the facilities to wash your hands. That was never taken away. The only thing we took away was the blanket policy." (Gueron Decl. Ex. 4 at 24.) The Plaintiffs have denied that these directives were followed and allege that requests for wash-up time were routinely denied.

According to the Plaintiffs, during the impasse period, the Postal Service refused all employee requests for wash-up time, including those made by employees engaged in dirty work.

Prior to the elimination of blanket fixed wash-up time, all employees were paid for wash-up. Employees were allowed to leave their work stations 12 or 15 minutes before their lunch periods began to wash up. The change in the wash-up rule meant that employees denied wash-up time had to **[*7]** work up to the beginning of their lunch period.

The issue of eliminating blanket fixed wash-up went to arbitration as contemplated by the National Agreement: arbitration began on January 7, 1997, included 92 days of testimony, and was resolved on March 31, 2000, when Arbitrator George R. Shea ruled that the blanket fixed wash-up periods provided by the LMOU were consistent with Article 8.9 and should be reinstated. (Gueron Decl. Ex. 1.)

The Postal Service reinstated blanket fixed wash-up on June 2, 2000.

The parties proceeded to a second arbitration on the following question: Does "the Postal Service [have] the right to unilaterally cease implementation of the previous LMOU provisions . . . and if not what should the remedy be?" (Gueron Decl. Ex. 6 at 2). Arbitrator Harry R. Gudenberg in his decision dated April 19, 2001, stated:

> The Service had the right to unilaterally cease the implementation of the wash-up provisions contained in the LMOU's for the Manhattan and Bronx Postal Operations for the period of the dispute. Since the Service had such rights, the grievance ... must be denied.

(Id. at 17-18.) Accordingly, no money damages were awarded to the Union, **[*8]** and the sole remedy allowed the Union was the already implemented reinstatement of blanket fixed wash-up.

## 2. The Clock-In Claims

Section 142 of the Postal Service Employee and Labor Relations Manual ("ELM") provides in pertinent part that:

> .11 Upon arrival, employees required to use timeclocks are to clock in at the scheduled reporting time and report to their work location ready to work ...

.12 After an employee has clocked in and the timecard has been placed back in the rack, the timecard is serving the purpose of an "assignment card" in that the card's presence in the rack indicated that the employee is assigned to and working at the particular work center.

.13 At mealtime, employees ... are to clock out at a master or auxiliary location. If an employee intends to return to the same work location after the meal period, then the employee must place the timecard in the designated rack ... If an employee has been assigned to report to a different work center after the meal period, then ... the supervisor where the employee clocked out is responsible for sending the timecard to the new location.

On May 4, 1996, the management of the Morgan facility **[*9]** directed Morgan-based employees to begin clocking-in at their work locations, rather than near the entry point of the work floor on which they were working. Before May 4, 1996, many clock-in stations at Morgan were located at the entry to each work floor, as well as at the entry into the facility.

Because Morgan is a large facility, covering several city blocks, the clock-in station relocation increased the off-the-clock travel time of those employees working farther from the work floor entrances. The Union brought a grievance concerning this new rule, and the grievance went to arbitration.

On April 14, 1999, the clock-in claims were heard at an arbitration hearing.

On July 14, 1999, Arbitrator Joseph S. Cannavo ruled that the Postal Service should "restore time clocks to their pre-May 4, 1996 location," (Gueron Decl. Ex. 9 at 31), but he denied the Union's request for an award of money damages, reasoning that such an award would be "punitive," since the employees "did not lose money." (Id. at 32.) Arbitrator Cannavo also noted that only Tour One employees n1 had grieved the rule, that the exact amount of time lost was difficult to calculate, and that, ultimately, "no exact **[*10]** remedy could be fashioned for each employee." (Id.)

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 The Postal Service workday is divided into three, 8.5 hour shifts, labeled "Tour One," "Tour Two," and "Tour Three."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On November 1 and 15 of 1999, the pre-1996 Morgan clock-in procedures were reinstated for the employees of all three tours, and Morgan-based employees were once again permitted to clock in at centralized locations near the entrance to their work floors.

### 3. Defendant's State of Mind with Respect to the Alleged FLSA Violations

A factual dispute exists as to whether the Postal Service's alleged violations of the FLSA were willful and showed reckless disregard for whether its conduct was prohibited.

According to the Plaintiffs, in May 1996, Sheridan and Morgan plant manager Elliot Siegel ("Siegel") were aware of a prior arbitration award issued in the late 1970's that reinforced the employees' right to the fixed wash-up time, and Sheridan was aware that the Union's position on the elimination of the fixed wash-up time was that **[*11]** it had already won the

issue in arbitration and had a right to continue it.

The Postal Service was allegedly on notice that (1) the Union intended to seek overtime pay for the elimination of the blanket wash-up time and all wash-up requests that were denied and (2) that the Union regarded the change in the clock-in procedures as a violation of the FLSA. Black allegedly did not discuss the elimination of blanket fixed wash-up time with anyone outside of his internal committee, neither with his legal department nor the national legal department.

According to the Plaintiffs, Siegel made the decision to change the clock-in procedures and did not seek legal advice on whether the change in clock-in procedures violated federal and/or state wage and hour laws and changed the clock-in procedures without prior notice to the Union and failed to bargain with the Union over the change.

### 4. Plaintiffs' Opt-In Procedures

This action was filed on July 6, 2001. The first opt-in consent forms, submitted to the Court on April 22, 2002, were initially rejected by the clerk of the court, and were subsequently docketed on May 21, 2002. Other plaintiffs subsequently filed opt-in forms on April 22, 2002, June 10, 2002, June 21, 2002, January 13, 2003, January 27, 2003, February 4, 2003, February 19, 2003, March 3, 2003, and **[*12]** May 15, 2003.

The New York Metro Area Union (the "Metro Union") have distributed at least two "Class Notices" soliciting participation in this suit. Opt-in consent forms are alleged to have been handed out by Union representatives in employee cafeterias, in the Union office, and at Union meetings. The contents and purpose of these materials are disputed.

William Smith, president of the Metro Union in 2002 ("Smith"), stated at union meetings that "the people that sign [the opt-in consent slips] would be the only people [who could] recover monies from the Postal Service . . . The ones who signed [the slips] would be the only ones that would be in the suit." (Gueron Decl. Ex. 23 at 10.) Other Union representatives stated that only employees who joined the action would be the only ones in the suit if money was recovered. The content of the advice concerning the right to sue is in dispute.

Smith personally selected at least one of the named plaintiffs, James Perez ("Perez"), for this suit. Plaintiff Derrick Reddick ("Reddick") testified as to his total additional daily travel time after May 4, 1996, which he said amounted to the time necessary to walk one city block. Plaintiff **[*13]** El testified that his total additional daily travel was 15 or 20 minutes and that he would have to walk out of the facility on his own time. The Plaintiffs worked at different work areas throughout Morgan from 1996 to 2000.

### Discussion

### 1. Summary Judgment Standard

*HN1* Under Rule 56(c), Fed. R. Civ. P., summary judgment is warranted when, in viewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

*HN2* A motion for summary judgment requires the party with the burden of proof at trial to "make a showing sufficient to establish the existence of an element essential to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). Where the "record **[*14]** taken as a

whole could not lead a rational trier of fact to find for the moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986) (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968)). Accordingly, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997 (quoting Fed. R. Civ. P. 56(c)).

## 2. The FLSA Claims

Plaintiffs have alleged that defendant violated provisions of the FLSA codified at 29 U.S.C. §§ 206 (minimum wage) and 207 (maximum hours).

## A. The Statute of Limitations

Defendants argue that the Plaintiff's FLSA claims are barred by the applicable statute of limitations.

## i. The Two Year Statute of Limitations Applies

*HN3* The statute of limitations **[*15]** for an FLSA claim is two years for a non-willful violation and three years for a willful violation. See 29 U.S.C. § 255(a). An FLSA violation is willful if an employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 100 L. Ed. 2d 115, 108 S. Ct. 1677 (1988); see Brock v. Superior Care, Inc., 840 F.2d 1054, 1062 (2d Cir. 1988) (same). Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the FLSA. See McLaughlin, 486 U.S. at 135. Plaintiffs bear the burden of proving that the Postal Service's conduct rises to the level of a willful violation. See Herman v. RSR Sec. Services Ltd., 172 F.3d 132, 141 (2d Cir. 1999).

According to the Plaintiffs, the issue of willfulness is a fact issue and defeats the Postal Service's motion. However, the Plaintiffs have failed to carry their burden of providing evidence that the Postal Service willfully or recklessly disregarded the FLSA. See, e.g., Gustafson v. Bell Atl. Corp., 171 F. Supp. 2d 311, 323-24 (S.D.N.Y. 2001); **[*16]** Lopez v. Corporacion Azucarera, 938 F.2d 1510, 1515 (1st Cir. 1991).

## a. Suspending Blanket Fixed Wash-Up During the Impasse Period Was Not a Willful FLSA Violation

As described above, Arbitrator Gudenberg held that (1) the Postal Service had the right to cease unilaterally the implementation of the LMOU wash-up provisions for the period of the impasse dispute, and (2) the Postal Service owed no money damages for exercising that right. Plaintiffs contend the Gudenberg decision resolved only the Postal Service's contractual obligations under the National Agreement and the LMOU, but not the FLSA claims.

However, FLSA liability and contractual liability are one and the same. The Postal Service's contractual obligations are the only possible source of any FLSA liability because *HN4* the FLSA expressly excludes wash-up time liability unless it is mandated by contract. n2 See 29 U.S.C. § 254(a),(b); 29 C.F.R. § 790.7(g) (wash up time not normally compensable under FLSA); Reich v. NYC Transit Auth., 45 F.3d 646, 651 (2d Cir. 1995) (same). If the LMOU did not require the Postal Service to pay for blanket **[*17]** fixed wash-up time during the impasse period, then neither does the FLSA. The Postal Service was entitled to act in good faith in its belief that the LMOU terms could be suspended in the impasse period, and the Gudenberg award proved that belief to be right.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The Plaintiffs have claimed that the Postal Service willfully violated the FLSA because it did not investigate whether its suspension of blanket fixed wash-up violated the FLSA. As described above, there is no FLSA right to compensation for wash-up time unless a contract provides such a right, and the Postal Service made reasonable inquiry into what the LMOU required. Black testified at his deposition that he discussed with his staff the legality of suspending blanket fixed wash-up, and "followed the rules that were laid out on impacts or items for locals." (Stampp Decl. Ex. 20 at 20, 34.) Given that there is no FLSA right to payment for wash-up time outside the LMOU, an examination of the LMOU rules was, effectively, an analysis of what the FLSA required.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*18]**

The plaintiffs maintain that because the LMOU incorporates a 1974 arbitration award on blanket fixed wash-up time (the "Dash Award"), suspending the LMOU wash-up terms was a willful FLSA violation. However, neither the Dash Award nor the LMOU by their terms establish any Postal Service obligation regarding the provision of wash-up during a negotiation impasse period. The Postal Service has pointed out that a 1987 national arbitration (the "Zumas award") directly addressed the question of rights during the impasse period and held that "the Service is entitled, under the Agreement, to cease unilaterally to honor and enforce LMOU provisions by declaring that such provisions were 'inconsistent or in conflict' with the National Agreement prior to the resolution of any such disputes through arbitration." (Gueron Decl. Ex. 25 at 20). Arbitrator Gudenberg applied the Zumas award holding to the exact facts of this case and found that the Postal Service had the right to suspend unilaterally blanket fixed wash-up during the impasse period. The Zumas and Gudenberg awards establish that the Postal Service had a good faith belief that it could act unilaterally without violating the FLSA.

The provisions **[\*19]** of the LMOU and Article 8.9 also support the conclusion that the Postal Service acted in good faith. Article 8.9 provides that: "installation heads shall grant reasonable wash-up time to those employees who perform dirty work or work with toxic materials. The amount of wash-up time granted each employee shall be subject to the grievance procedure." The Postal Service would appear to have reasonably understood these terms to imply discretion, rather than a mandatory, blanket rule regarding the amount of time available or the employees eligible for wash-up. By contrast, the blanket fixed wash-up rules of the LMOU permit no managerial discretion and grant the same amount of wash-up time to every employee. Thus, the very language of the two provisions gave the Postal Service a good faith basis to believe that they were inconsistent.

This conclusion was supported by the decisions of the arbitrators who reviewed this matter. Arbitrator Gudenberg expressly ruled that "both parties had valid reasons for the positions they have taken" and Arbitrator Shea, despite his ruling that blanket fixed wash-up was inconsistent with Article 8.9, noted that the relationship between Article 8.9 and the **[\*20]** LMOU was "ambiguous." No arbitrator held, much less implied, that the Postal Service violated the FLSA or acted in bad faith or unreasonably when it suspended blanket fixed wash-up on May 4, 1996.

Before implementing any change, the Postal Service apparently bargained with the local union to try to reach a solution closer to the provisions of Article 8.9 than the LMOU's blanket fixed wash-up rules. The Union called the wash-up issue "non-negotiable" and claimed that raising it was an act of discrimination. The wash-up issue went to impasse.

Next, the Postal Service apparently sought to implement a discretionary wash-up policy under Article 8.9 for the negotiation impasse period, instructing its managers that:

> each request for wash-up should be handled on a case-by-case basis ... The amount of wash-up time which is granted should relate to the work performed by the employee. Time could vary with each request due to the fact that the work performed by different individuals and even the work performed by the same individual could vary from day-to-day and time of day.

(Gueron Dec. Ex. 5 at 2-3).

Moreover, Arbitrator Gudenberg found that the Postal Service did not eliminate **[\*21]** wash-up during the impasse period. He stated that "wash-up time did occur for many employees as testified to by the Union's witnesses." Rather, to assist managers with determining when reasonable wash-up should be granted, the Postal Service created a "Guideline to Wash-Up Categories By Job Title," to be used as follows:

> Job titles are listed under the headings "usually not," "sometimes" and "more likely." This guideline lists those jobs which Management has assessed to be those that are usually not involved in dirty work, sometimes involved in dirty work and more likely to be involved in dirty work. The amount of reasonable wash-up time granted per Article 8 Section 9 would be dependent on the work performed on any given day. Not all employees perform the same work every day, nor are they necessarily involved in "dirty work or work with toxic materials" on a daily basis. Indeed, it is feasible that a job classification under "more likely" might not, on any given day, necessitate the need for wash-up as contemplated under Article 8.9 of the National Agreement. This key is to use common sense and make a decision on a case by case basis.

(Id.). The Postal Service **[\*22]** instructed its managers that "this policy does not mean that there should be blanket denial of wash-up time. Rather, wash-up time should be granted consistent with the terms of Article 8, Section 9 of the National Agreement.

In sum, the Gudenberg award is preclusive n3 on the issue of whether the Post Office committed a willful violation of the FLSA with respect to the suspension of the blanket wash-up times during the period of the impasse. Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) (stating that *HN5* "collateral estoppel can be predicated on arbitration proceedings") (collecting cases). Thus, the two-year statute of limitations applies.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

N3 With respect to issue preclusion, the Second Circuit has stated:

> a party is collaterally estopped from relitigating an issue if a four-part test is met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous had a 'full and fair proceeding; (3) the party the issue; and (4) the opportunity' to litigate resolution of the issue was 'necessary to support a valid and final judgment on the merits.'"

**Boguslavsky v. Kaplan**, 159 F.3d 715, 720 (2d Cir. 1998) (quoting **Interoceanica Corp. v. Sound Pilots, Inc.**, 107 F.3d 86, 91 (2d Cir. 1997)).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[*23]**

### b. Changing Clock-In Locations Was Not a Willful FLSA Violation

As to the relocation of clock-in locations at the Morgan facility, Plaintiff's have failed to create a triable issue of fact as to whether the defendant willfully violated the FLSA. Siegel testified that he believed in good faith that the clock-in station relocations were permitted under the ELM, and had previously ordered the movement of clock locations without any Union complaint of FLSA violations. He stated that he discussed the May 1996 clock relocations with the labor relations staff and Sheridan, who advised him that clock movement "was not uncommon . . . and there was no objection by the union." The ELM requires that employees punch clocks "at a master or auxiliary location," and that timecards serve as "an assignment card . . . at the particular work center." Siegel alleges that he reasonably understood these provisions to require an employee to clock in "as close as possible to [his] work location." Nothing in Siegel's conduct implies a willful or reckless violation of the FLSA.

Based on the foregoing, summary judgment is granted in favor of the defendant on the question of whether the Postal **[*24]** Service's conduct was willful, and the two-year statute of limitations will therefore be applied.

### ii. The Statute of Limitations Does Not Stop Running Until a Plaintiff Opts Into the Suit

*HN6*☞In an FLSA collective action suit, the statute of limitations continues to run until the plaintiff files a written consent opting into the suit. A collective action suit begins for any individual plaintiff only:

> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

> (b) if such written consent was not so filed or if his name did not so appear -- on the subsequent date on which such written consent is filed in the court in which the action was commenced.

29 U.S.C. § 256; accord 29 U.S.C. § 255 (action commenced once written consent filed).

An FLSA collective action suit is not a typical class action subject to Fed. R. Civ. P. 23, in which a potential plaintiff is included as a class member unless he chooses **[*25]** to opt out of the class. See Cahill v. City of N.B., 99 F. Supp. 2d 464, 478 (D.N.J. 2000). A potential member of an FLSA collective action suit must expressly opt into the suit by "giving his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

Thus, all plaintiffs, including named plaintiffs, must file written consents in order to begin their lawsuits, and the courts have made clear that a suit does not begin until a consent has been filed. See Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 101, 104 (S.D.N.Y. 2003) ("only by 'opting in' will the statute of limitations on potential plaintiffs'

claims be tolled"); Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 260 (S.D.N.Y. 1997) (same); Hasken v. Louisville, 234 F. Supp. 2d 688, 691 (W.D. Ken. 2002) ("The statute of limitations [in an FLSA collective action case] continues to run as to each individual plaintiff until he or she files a written consent to become part of the action."); Bonilla v. Las Vegas Cigar Co., 61 F. Supp. 2d 1129, 1132-33 (D. Nev. 1999); **[*26]** Songu-Mbriwa v. Davis Memorial Goodwill Indus., 144 F.R.D. 1, 2 (D.D.C. 1992) ("Until a plaintiff, even a named plaintiff, has filed a written consent, she has not joined in the class action, at least for statute of limitations purposes.").

The Plaintiffs have alleged that the class on whose behalf the action was brought, includes "thousands" of current or former USPS employees. The complaint acknowledges Plaintiffs' obligations to file written consents to opt in to the suit, citing section 216(b) of the FLSA. (Compl. P 84). In so doing, the Plaintiffs have conceded that they were required to comply with the opt-in rules governing collective action suits before their suit could begin.

### iii. Summary Judgment Is Granted as to Claims Based on Conduct Pre-Dating May 21, 2000

For statute of limitations purposes, this action began for some number of the plaintiffs on May 21, 2002, when the first consents were filed and docketed with the court. The Plaintiffs have claimed that the parties agreed that the consents would be "deemed filed" on April 22, 2002, when Plaintiffs initially attempted to file them and were turned away by the court clerk. The Postal Service **[*27]** denies reaching any such agreement; the court docket reflects that the first consent form was filed on May 21, 2002. The Plaintiffs have not sought to have this alleged docket sheet error corrected and any agreement between counsel to alter the court clerk's filing requirements would have needed the Court's approval to be effective. Cf. In re Soter, 31 B.R. 986, 990 (D. Vt. 1983) (court rules and time requirements cannot be "altered at the parties' will").

Because the first opt-in forms were filed with the Court on May 21, 2002, summary judgment is granted dismissing all claims based on conduct pre-dating May 21, 2000. Since the wash-up rules were reinstated on June 2, 2000, only those wash-up claims based on the two-week period from May 21st to June 2nd of 2000 can survive defendant's motion for summary judgment. Since the Morgan clock-in locations were reinstated on November 1, 1999, all clock-in claims are barred by the two-year statute of limitations.

### B. There is No Genuine Issue of Material Fact as to Whether Wash-Up Was Denied During the Impasse Period to Those Employees Engaged in Dirty Work

The Plaintiffs contend that there is a dispute of fact **[*28]** as to whether the Postal Service denied reasonable wash-up time during the impasse period, as the Postal Service directed in its May 1996 memorandum. The Plaintiffs have testified that Postal Service managers denied wash-up time even to those employees legitimately engaged in dirty work. (See Stamp Decl. Exs. L at 37; Ex. O at 36; Ex. P at 7-8, 36, 46-48; Ex. M. at 36). However, Arbitrator Gudenberg decided that question, ruling that "wash-up time did occur for many employees as testified to by the Union's witness," citing the following Union witness testimony:

> Q: What, if anything did you ascertain about the enforcement of wash-up -- the no fixed wash-up policy in carrier stations in Manhattan and in the Bronx?
>
> A: For the most part, the clerks, maintenance employees there is no motor vehicle assigned to carrier-delivery stations, but for the most part the clerks and maintenance employees continued to enjoy the same benefit of wash-up in these facilities. I won't say that that's unanimous, but it was the majority.

This finding demonstrates that there is no genuine dispute of fact regarding the Postal Service's denial of reasonable wash-up time during the impasse **[\*29]** period to those employees engaged in dirty work. It is, therefore, appropriate to defer to Arbitrator Gudenberg's award. Cf. Landy Michaels Realty Corp. v. Local 32B-32J, Service Employees Int'l Union, 954 F.2d 794, 797 (2d Cir. 1992) ("**HN7** an arbitration award should be enforced, despite a court's disagreement with it on the merits, if there is a 'barely colorable justification for the outcome reached'"); Merrill Lynch v. Bobker, 808 F.2d 930, 933-34 (2d Cir. 1986) (arbitration decision should be upheld absent "manifest disregard of the law"); Clarendon Nat'l. Ins. Co. v. TIG Reinsurance Co., 990 F. Supp. 304, 308-09 (S.D.N.Y. 1998) (following Landy Michaels); Whirlpool Corp. v. Philips Electronics, N.V., 848 F. Supp. 474, 478-79 (S.D.N.Y. 1994) (recognizing deference owed to arbitration decision).

## C. The Clock-In Claims Are Not De Minimis

Arbitrator Cannavo determined that the change in clock-in procedures adversely impacted employees by (1) increasing their work day from eight hours to as much as eight hours and ten minutes; and (2) decreasing their lunch period by five to ten minutes.

The Second Circuit in Reich v. New York City Transit Authority, 45 F.3d 646, 652 (2d Cir. 1994), **[\*30]** adopted **HN8** the three factor test enunciated in Lindow v. United States, 738 F.2d 1057, 1062-63 (9th Cir. 1984), to determine whether otherwise compensable time should be considered de minimis and therefore not compensable. These factors are as follows: (1) the practicable administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether "the claimants performed the work on a regular basis." Id.; see also Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 719 (2d Cir. 2001). The Reich court held that time spent by police officers commuting to and from work accompanied by the police dogs entrusted to them was de minimis. Reich, 45 F.3d at 647.

The time spent by the Postal Service employees in transit is distinguishable from the commuting time in question in Reich. In Reich the court determined that officers rarely had to spend commuting time caring for their police dogs. Here, the record suggests that affected employees spent twenty to thirty minutes each day in transit within the Morgan facility to get to and from their work assignments. See Kosakow, 274 F.3d at 719 **[\*31]** (fifteen minutes of preparatory work is not de minimis). Further, following the elements of the Reich test, (1) it would not be difficult to calculate the additional uncompensated time, (2) the aggregate amount of uncompensated time is significant, and (3) the work in question occurred regularly.

Based on the foregoing, defendant's motion for summary judgment on the clock-in claims on the grounds that they are de minimis is denied.

## D. The Unnamed Plaintiffs Are Not Barred By Improper Solicitation

The Postal Service argues that improper solicitations by the Union bars the unnamed plaintiffs from recovery. Because the proposition is without authority and because it has not been established that the named Plaintiffs relied upon the improper solicitations, summary judgment on this ground is denied.

The Supreme Court has explained that **HN9** a court has "a substantial interest in communications that are mailed for single actions involving multiple parties . . . [because] although the collective form of action is designed to serve [an] important function . . . the potential for misuse of the class device, as by misleading communications, may be countered

by court-authorized **[*32]** notice." Hoffman-LaRoche Inc. v. Sperling, 493 U.S. 165, 171, 107 L. Ed. 2d 480, 110 S. Ct. 482 (1989). Accordingly, although section 216(b) of the FLSA permits notice to potential plaintiffs in FLSA class action suits, only the court has the power to approve such notice:

> By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative. Both parties and the court benefit from settling disputes about the content of the notice before it is distributed. This procedure may avoid the need to cancel consents obtained in an improper manner.

Id. at 172.

Since the Supreme Court's decision in Hoffman-LaRoche, district courts have ruled that they have discretionary power to authorize the sending of notices to potential class members in a collective action brought pursuant to FLSA. See, e.g., Madrid v. Minolta Bus. Solutions, Inc., 2002 U.S. Dist. LEXIS 18539, 02 Civ. 2294 (GOD), 2002 WL 31190172, at *1 (S.D.N.Y. Oct. 2, 2002); Realite v. Ark Restaurants Corp., 7 F. Supp. 2d 303, 305-06 (S.D.N.Y. 1998); Hoffmann v. Sbarro, Inc., 982 F. Supp. 249, 260 (S.D.N.Y. 1997); Severtson v. Phillips Beverage Co., 137 F.R.D. 264, 265-66 (D. Minn. 1991). **[*33]**

Without seeking court approval or even giving the Court notice, Plaintiffs distributed at least two "Class Notices" soliciting participation in this suit. To encourage participation in the lawsuit, class notices and opt-in consent forms were distributed in the employee cafeteria, in the union office, and at union meetings. Smith stated at union meetings that "the only people [who would] get reimbursed . . . would be the people who signed the [opt-in consent] slips." (Gueron Decl. Ex. 23 at 7-8.)

In taking these steps, the Plaintiffs arguably deprived the Court of its role in crafting a proper opt-in notice and prevented the defendant from asking the Court to tailor the opt-in solicitation to recognize limits such as the statutes of limitations governing Plaintiffs' claims. The notices here were untimely and inaccurate to the extent that they (1) wrongly stated that "if you choose not to join this suit, you will be affected by any judgment or settlement rendered in this case, whether favorable or unfavorable to the class"; (2) failed to inform potential plaintiffs that all claims for at least the years 1996 through 1998 were time barred; (3) failed to state that damages for lost **[*34]** transit time could be earned only by those Morgan station employees whose transit time actually increased after May 4, 1996; and (4) failed to explain that damages might well be available only to those employees who could demonstrate (a) how much time they had spent washing up before May 4, 1996, and (b) that they had sought permission to wash-up after May 4, 1996, and been denied the opportunity.

At issue is the proper remedy under these circumstances.

The Postal Service argues that a plaintiff cannot send a notice to other potential plaintiffs until he has made a factual showing to the court and has won the court's approval. However, the FLSA, on its face, is silent on the issue of notice to potential class members. Moreover, the defendant has cited no authority for the proposition that if opt-in consents were improperly or illegally obtained, blanket cancellation of the consents is the appropriate remedy. It is significant that in Hoffman-La Roche, the Supreme Court declined to disturb the district court's rejection of the defendant's request to invalidate consents that were obtained

and filed without court approval.

*HN10* The threshold issue in deciding whether to authorize a **[*35]** class notice in an FLSA action is whether plaintiffs have demonstrated that potential class members are "similarly situated." See 29 U.S.C. § 216(b). Courts have held that plaintiffs can meet this burden by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law. Realite, 7 F. Supp. 2d 303 at 306 (S.D.N.Y. 1998). Some court have authorized class notices based solely upon the allegations contained in the complaint. See e.g., Allen v. Marshall Field & Co., 93 F.R.D. 438, 442-45 (N.D. Ill. 1982).

The allegations contained in the complaint meet Plaintiffs' modest burden here. It is undisputed that defendant's practice or policy with respect to the elimination of fixed wash-up time affected the Manhattan and Bronx employees. Similarly, it is equally undisputed that the change in the clock-in procedures at the Morgan facility affected the entire Morgan workforce.

In the context of a motion for summary judgment, it is the Postal Service's burden to establish which opt-in consents were illegally obtained. No such **[*36]** particularized showing has been made to this point. Should discovery reveal that an opt-in resulted from an improper class solicitation, some form of appropriate relief presumably would be available by motion. See, e.g. Partlow v. Jewish Orphans' Home, Inc., 645 F.2d 757, 759 (9th Cir. 1981) (stating that the district court had the power to invalidate plaintiff opt-ins that were improperly solicited).

Based on the foregoing, the defendant's motion summary judgment dismissing the claims of the unnamed plaintiffs is denied.

### E. Liquidated Damages Are Unavailable

Since the Postal Service acted in good faith, as discussed above, the liquidated damages claim should be dismissed. See 29 U.S.C. § 260 (*HN11* the court has discretion to award no liquidated damages where employer acted in good faith). The question of liquidated damages is determined by the Court. See Brock v. Superior Care, Inc., 840 F.2d 1054 (2d Cir. 1988) ("Since an award of liquidated damages under section 16 is within the discretion of the district judge, 29 U.S.C. § 260, no right to a jury is available on that issue). Because **[*37]** of the determination of good faith on the part of the Postal Service as set forth above, liquidated damages are inapplicable.

Based on the foregoing, defendant's motion for summary judgment dismissing plaintiffs' claims for liquidated damages is granted.

### 2. The New York Minimum Wage Act Is Inapplicable

*HN12* The New York State Minimum Wage Act ("NYSMWA") excludes from coverage those people employed "by a federal, state or municipal government or political subdivision thereof." N.Y. Labor Law § 651(5)(n). This rule excludes Postal Service employees from the NYSMWA's coverage. n4

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -


n4 In addition, Plaintiffs ignore the government's argument that the NYSMWA required Plaintiffs to move for Rule 23-type class certification to proceed with this collective action suit. See Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 84-85 (S.D.N.Y. 2001).

Because Plaintiffs have never done so, the NYSMWA collective action claims should be dismissed.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiffs contend that the **[\*38]** NYSMWA covers Postal Service employees because "the Postal Service is not a 'true' government entity." However, in February 2004, the United States Supreme Court decided, unanimously, that "the Postal Service is part of the Government," not outside of the government. United States Postal Service v. Flamingo Indus. (USA) Ltd., 540 U.S. 736, 124 S. Ct. 1321, 1327, 158 L. Ed. 2d 19 (Feb. 25, 2004). The Supreme Court explained:

> The statutory designation of the Postal Service as an "independent establishment of the executive branch of the Government of the United States" [39 U.S.C. § 201] is not consistent with the idea that it is an entity existing outside the Government. The statutory instruction that the Postal Service is an establishment "of the executive branch of the Government of the United States" indicates just the contrary. The PRA [Postal Reorganization Act] gives the Postal Service a high degree of independence from other offices of the Government, but it remains part of the Government.

Flamingo Industries, 124 S. Ct. at 1328. The Supreme Court relied upon the Postal Service's characteristically **[\*39]** governmental powers, such as eminent domain, the ability to negotiate international postal agreements, and its monopolistic control of mail delivery, and noted that "after the Revolution, both the Articles of Confederation and the Constitution explicitly empowered the National Government to provide and regulate postal services." Id. at 1324, 1329. The Supreme Court's holding is consistent with earlier Second Circuit cases upholding the Postal Service's governmental status. See Young v. Postal Service, 869 F.2d 158, 159 (2d Cir. 1989) (suit against the Postal Service is suit against the federal government); see also Matos v. Runyon, 1998 U.S. Dist. LEXIS 22531, 95 Civ. 2012 (AWT), 1998 WL 229839, at \*6 (D. Conn. Mar. 25, 1998) (same).

Plaintiffs have provided no case law or evidence indicating that the New York State Legislature intended to include a federal entity such as the Postal Service in the NYSMWA or to intrude upon the nuanced relationship between the federal government and the Postal Service. Accordingly, Postal Service employees are federal employees excluded from the NYSMWA, and the NYSMWA claims are dismissed.

Based on the foregoing, defendant's motion for summary **[\*40]** judgment dismissing plaintiffs' NYSMWA claims is granted.

## Conclusion

Based on the foregoing, the Court holds as follows:

> (1) No genuine issue of material fact exists as to whether the defendant's conduct was willful. Therefore the two year statute of limitations is applicable to Plaintiffs' FLSA claims.

(2) The statute of limitations continued to run on each plaintiff's FLSA claims until such time as that plaintiff opted into the lawsuit.

(3) Summary judgment in favor of the defendant is granted as to FLSA claims based on conduct pre-dating May 21, 2000.

(4) Plaintiffs have failed to present evidence to create a genuine issue of fact as to whether wash-up time was denied during the impasse period to those Plaintiffs engaged in dirty work.

(5) Defendant's motion for summary judgement is denied to the extent that it sought dismissal of Plaintiffs' clock-in claims on the grounds that they are de minimis.

(6) Defendant's motion for summary judgment is denied to the extent that it sought dismissal of the FLSA claims of the unnamed plaintiffs on the grounds that they are barred as a result of improper solicitation.

(7) Defendant's **[*41]** motion for summary judgment is granted to the extent that it sought dismissal of Plaintiffs' claims for liquidated damages based on the FLSA claims.

(8) Defendant's motion for summary judgment is granted to the extent that it sought dismissal of Plaintiffs' NYSMWA claims.

It is so ordered.

**New York, NY**

**December 6, 2004**

**ROBERT W. SWEET**

**U.S.D.J.**

Service: **Get by LEXSEE®**
Citation: **2004 U.S. Dist. lexis 24447**
View: Full
Date/Time: Monday, February 5, 2007 - 10:28 AM EST

* Signal Legend:
- Warning: Negative treatment is indicated
[Q] - Questioned: Validity questioned by citing refs
△ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis® About LexisNexis | Terms & Conditions
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights

reserved.